## THE UNITED STATES v. JOHN D. QUINCY.

Indictment under the third section of the act for the punishment of certain crimes against the United States, &c. passed April 20, 1818. The indictment charged the defendant with being knowingly concerned in the fitting out, in the port of Baltimore, a vessel, with intent to employ her in the service of a foreign " people," the United Provinces of Buenos Ayres; against the subjects of the emperor of Brazil, with whom the United States were at peace. The vessel went from Baltimore to St Thomas, and was there fully armed. She afterwards cruised under the Buenos Ayrean flag. To bring the defendant within the words of the act, it is not necessary to charge him with being concerned in fitting out *and* arming the vessel; the words of the act are " fitting out *or* arming." Either will constitute the offence. It is sufficient if the indictment charges the offence in the words of the act.

It is true, that with respect to those who have been denominated at the bar, the chief actors, the law would seem to make it necessary that they should be charged with fitting out *and* arming. The words may require that both shall concur, and the vessel be put in a condition to commit hostilities in order to bring her within the law; but an *attempt* to fit out *and* arm is made an offence. This is certainly doing something short of a complete fitting out and arming.

To attempt to do an act does not, either in law or in common parlance, imply a completion of the act, or any definite progress towards it. Any effort or endeavour to effect it, will satisfy the terms of the law. It is not necessary that the vessel, when she left Baltimore for St Thomas, and during the voyage from Baltimore to St Thomas, was armed, or in a condition to commit hostilities, in order to find the defendant guilty of the offence charged in the indictment.

The defence consists, principally, in the intention with which the preparations to commit hostilities were made. These preparations, according to the very terms of the act, must be made within the limits of the United States; and it is equally necessary that the intention with respect to the employment of the vessel, should be formed before she leaves the United States. And this must be a fixed intention; not conditional or contingent, depending on some future arrangements. This intention is a question belonging exclusively to the jury to decide. It is the material point, on which the legality or criminality of the act must turn; and decides whether the adventure is of a commercial or a warlike character.

The law does not prohibit armed vessels belonging to citizens of the United States from sailing out of our ports; it only requires the owners to give security that such vessels shall not be employed by them to commit hostilities against foreign powers at peace with the United States.

The collectors are not authorised to detain vessels, although manifestly built for warlike purposes, and about to depart from the United States; unless circumstances shall render it probable that such vessels are intended to be employed by the owners to commit hostilities against some foreign power, at peace with the United States. All the latitude, therefore, necessary for commercial purposes is given to our citizens; and they are restrained only from such acts as are calculated to involve the country in war.

If the defendant was knowingly concerned in fitting out the vessel within the

[United States v. Quincy.]

United States with intent that she should be employed to commit hostilities against a state or prince, or people, at peace with the United States; that intention being defeated by what might afterwards take place in the West Indies, would not purge the offence, which was previously consummated. It is not necessary that the design or intention should be carried into execution, in order to constitute the offence.

The indictment charges that the defendant was concerned in fitting out the Bolivar with intent that she should be employed in the service of a foreign *people;* that is to say, in the service of the United Provinces of Rio de la Plata. It was in evidence that the United Provinces of Rio de la Plata had been regularly acknowledged as an independent nation by the executive department of the government of the United States, before the year 1827. It was argued that the word *people* is not applicable to that nation or power. By the court: The objection is one purely technical, and we think not well founded. The word " people," as here used, is merely descriptive of the power in whose service the vessel was intended to be employed: and it is one of the denominations applied by the act of congress to a foreign power.

THIS case came before the court on a certificate of division of opinion by the judges of the circuit court of the United States for the district of Maryland.

An indictment was found against the defendant in that court at May term 1829, founded on the third section of the act of congress, passed April 20, 1818, entitled " an act in addition to the ' act for the punishment of certain crimes against the United States,' and to repeal the acts therein mentioned."

The third section provides: that if any person shall, within the limits of the United States, fit out *and* arm, or attempt to fit out *and* arm, or procure to be fitted out *and* armed, or shall knowingly be concerned in the furnishing, fitting out *or* arming of any ship or vessel with intent that such ship or vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people with whom the United States are at peace, or shall issue or deliver a commission within the territory or jurisdiction of the United States for any ship or vessel, with the intent that she may be employed as aforesaid, every person so offending shall be guilty of a high misdemeanour, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years; and every such ship or vessel, with her tackle, apparel and furniture, together with all materials, arms, ammunition and stores, which may have been procured for the building and

equipment thereof, shall be forfeited; one half to the use of the informer, and the other half to the use of the United States.

The indictment contained fifteen counts, upon two only of which evidence was given; and the questions upon which the judges of the circuit court were divided in opinion, arose on those counts, and on the evidence in reference to the matters stated in them. They were the 12th and 13th counts.

12. And the jurors aforesaid, upon their oath aforesaid, do further present, that the said John D. Quincy, on the day and year aforesaid, at the district aforesaid, within the limits of the United States, and within the jurisdiction of the United States and of this court, with force and arms, was knowingly concerned in the fitting out of a certain vessel called the Bolivar, otherwise called Las Damas Argentinas, with intent that such vessel be employed in the service of a foreign people, that is to say, in the service of "the United Provinces of Rio de la Plata," to commit hostilities against the subjects of a foreign prince, that is to say, against the subjects of "his imperial majesty, the constitutional emperor and perpetual defender of Brazil," with whom the United States then were, and still are at peace, against the form of the act of congress in such case made and provided, and against the peace, government and dignity of the United States.

13. And the jurors aforesaid, upon their oath aforesaid, do further present, that the said John D. Quincy, on the day and year aforesaid, at the district aforesaid, within the limits of the United States, and within the jurisdiction of the United States and of this court, with force and arms, was knowingly concerned in the fitting out a certain other vessel, called the Bolivar, otherwise called Las Damas Argentinas, with intent that the said vessel should be employed in the service of a foreign people, that is to say, in the service of the United Provinces of Rio de la Plata, to cruise and commit hostilities against the subjects and property of a foreign prince, that is to say, against the subjects and property of his imperial majesty the constitutional emperor and perpetual defender of Brazil, with whom the United States then were and still are at peace, against the form of the act of congress in such case made and provided, and against the peace, government and dignity of the United States.

[United States v. Quincy.]

The defendant pleaded not guilty; and the cause came on to be tried before the circuit court, on the 8th day of April 1830.

On the part of the United States evidence was given of the repairing and fitting out of the schooner Bolivar in the port of Baltimore in 1827. That she was originally a Maryland pilot boat of sixty or seventy tons. The work was done at the request of Henry Armstrong and of the defendant, who super-intended the same; that she was fitted with sails and masts larger than those required for a merchant vessel, and was altered in a manner to suit her carrying passengers, and with a port for a gun. This evidence on the part of the United States was intended to apply to the twelfth and thirteenth counts in the indictment, and to sustain the allegations therein.

It was in proof, that the Bolivar sailed from Baltimore for St Thomas on the 27th September 1827, having on board provisions, thirty-two water casks, one gun carriage and slide, a box of muskets and thirteen kegs of gunpowder, and after a bond had been given by John M. Patterson as master, and George Stiles and Victor Valette of Baltimore as owners, not to commit hostilities against the subjects or property of any prince or state, or of any colony, district or people with whom the United States were at peace. After her arrival at St Thomas, Armstrong had no funds, and was uncertain whether he could get funds. At St Thomas she was fitted as a privateer and sailed to St Eustatia, having changed her name to Las Damas Argentinas; the defendant was her captain during the subsequent cruise. Armstrong was on board, not as an officer, but as an owner, and as agent for the other owners. Armstrong on the voyage from Baltimore told a witness, that if the vessel went privateering it would be under the Buenos Ayrean flag; and that he had procured a commission for the Bolivar from an agent of the Buenos Ayrean government at Washington, for eight hundred dollars.

A witness swore that he conversed with Armstrong about going to the West Indies, that Armstrong told him it was his intention, or rather his wish, to employ the Bolivar as a privateer; but he had no funds to fit her out as such, and could not tell, until he got to the West Indies, what he might ultimately do. Armstrong wanted witness in Baltimore to advance some

[United States v. Quincy.]

funds, and told him he would be glad if witness would go as surgeon.  He spoke of the difficulty of getting funds, both in Baltimore and in the West Indies.  The witness knew that Armstrong had no funds when he arrived in the West Indies, and was two or three days negotiating with Cabot and Co. of St Thomas, and was uncertain of there getting funds.

From St Eustatia the vessel proceeded, under the Buenos Ayrean flag, and captured several vessels, Portuguese, Brazilian and Spanish; which were ordered, in consequence of the blockade of the Rio de la Plata, to the West Indies, in pursuance of instructions from the government of Buenos Ayres. The cruise terminated on the 1st of March 1828: one prize and cargo produced thirty-five thousand dollars, which was distributed among the crew.

It was admitted that before the year 1827, the United Provinces of Rio de la Plata had been regularly acknowledged as an independent nation, by the executive department of the government of the United States.

The defendant moved the circuit court for their opinion and direction to the jury:

1. That if the jury believe, that, when the Bolivar left Baltimore, and when she arrived at St Thomas, and during the voyage from Baltimore to St Thomas, she was not armed or at all prepared for war, or in a condition to commit hostilities; the verdict must be for the traverser.

2. That if the jury believe that when the Bolivar was fitted and equipped at Baltimore, the owner and equipper intended to go to the West Indies in search of funds with which to arm and equip the said vessel, and had no present intention of using or employing the said vessel as a privateer, but intended when he equipped her, to go to the West Indies, to endeavour to raise funds to prepare her for a cruise; then the traverser is not guilty.

3. That if the jury believe, that when the Bolivar was equipped at Baltimore, and when she left the United States, the equipper had no fixed intention to employ her as a privateer, but had a wish so to employ her, the fulfilment of which wish depended on his ability to obtain funds in the West Indies, for the purpose of arming and preparing her for war; then the traverser is not guilty.

Vol. VI.—3 G.

4. That according to the evidence in this cause, the United Provinces of Rio de la Plata is, and was at the time of the offence alleged in the indictment, a government acknowledged by the United States; and that the United Provinces of Rio de la Plata is, and then was a state, and not a people within the meaning of the act of congress under which the traverser is indicted; the word "people" in that act being intended to describe communities under an existing government, not recognized by the United States; and that the indictment therefore cannot be supported on this evidence.

The district attorney of the United States moved the court for their opinion and direction to the jury:

1. That if the jury find from the evidence, that the traverser was, within the district of Maryland, knowingly concerned in the fitting out of the privateer Bolivar, alias Las Damas Argentinas, with intent that such vessel should be employed in the service of the United Provinces of Rio de la Plata, to commit hostilities, or to cruise and commit hostilities, against the subjects, or against the subjects and property of his imperial majesty, the constitutional emperor and perpetual defender of Brazil, with whom the United States were at peace, then the traverser has been guilty of a violation of the *third* section of the act of congress of the 20th of April 1818, which punishes certain offences against the United States; although the jury should further find, that the equipments of the said privateer were not complete within the United States, and that the cruise did not actually commence until men were recruited, and further equipments were made at the island of St Thomas in the West Indies; and should further find that the Bolivar, on her voyage from Baltimore to St Thomas, had no large gun, no flints, nor any cannon or musket balls, and that the muskets and sabres were, during the voyage, nailed up in boxes.

2. That if the jury find from the evidence, that the traverser was, within the district of Maryland, knowingly concerned in the fitting out of the privateer Bolivar, alias Las Damas Argentinas, with intent that such vessel should be employed in the service of the United Provinces of Rio de la Plata, to commit hostilities, or to cruise and commit hostilities against the subjects, or against the subjects and property of his imperial ma-

jesty, the constitutional emperor and perpetual defender of Brazil, with whom the United States then were at peace, then the traverser has been guilty of a violation of the *third* section of the act of congress of the 20th of April 1818, which punishes certain crimes against the United States; although the jury should further find, that the intention so to employ the said vessel was liable to be defeated by a failure to procure funds in the West Indies, where further equipments were intended and required to be made, before actually commencing the contemplated cruise.

3. That if the jury find from the evidence, that the traverser was, within the district of Maryland, knowingly concerned in the fitting out of the privateer Bolivar, alias Las Damas Argentinas, with intent that such vessel should be employed in the service of the United Provinces of Rio de la Plata, to commit hostilities, or to cruise and commit hostilities against the subjects, or against the subjects and property of his imperial majesty, the constitutional emperor and perpetual defender of Brazil, with whom the United States then were at peace, then the traverser has been guilty of a violation of the *third* section of the act of congress of the 20th of April 1818, which punishes certain crimes against the United States; although the jury should further find, that the fulfilment of the intentions so to employ the said vessel, would have been defeated if further funds had not been obtained in the West Indies, where further equipments were intended and required to be made before actually commencing the contemplated cruise.

4. That the twelfth and thirteenth counts in the indictment are good and sufficient in law, whereon to found a conviction; notwithstanding the employment therein of the words "in the service of a foreign people, that is to say" preceding the words "in the service of the United Provinces of Rio de la Plata."

Upon the aforesaid prayers, and upon each of them, the judges were opposed in opinion; and thereupon the court ordered the same to be certified to the supreme court of the United States.

The case was argued by Mr Williams, for the United States: and by Mr Wirt, for the defendant.

Mr Williams, for the United States, contended, in support

of their first prayer, that the guilty intention having been proved to have existed in the mind of the traverser in the United States, and the guilty enterprise having actually commenced there, the traverser is guilty of a violation of the third section of the act of the 20th of April 1818; although the equipments were not completed in the United States, and although the cruise was not commenced, nor the Bolivar prepared to commence her cruise, until after her arrival in St Thomas.

The section in question punishes the fitting out and arming; the attempting to fit out and arm; the procuring to be fitted out and armed; and, with a view to comprehend all who shall have any participation in disturbing the neutral relations of the United States, it punishes those who shall be *knowingly concerned in the furnishing, fitting out or arming* any ship or vessel, with intent, &c. The offence charged here is for being knowingly concerned in fitting out, &c.

The Bolivar was in fact not only fitted out in the port of Baltimore, but was partially armed; having on board muskets, sabres, powder and a gun carriage, and a commission to cruise.

If it be necessary for the completion of the offence, that the vessel should not only be fitted out, but also armed, it is manifest that this important act of congress, required by the laws of nations, and essential to preserve the peace of this country with foreign nations, will become a dead letter. For it is not only easy to evade its provisions, but at least equally convenient to do so, by having some additional equipments, however inconsiderable, to be effected abroad. This position admits that the attempt to fit out and arm, however small the progress therein, is an offence; while the complete fitting out, having a commission on board, with the most flagrant intention to privateer, is no infringement of the act. The slightest augmentation to an armed vessel, is undeniably an offence under the fifth section.

The policy and scope of this whole law, so far from restraining the express terms used in this section, afford the strongest aid towards a literal construction of those terms. The twelfth and thirteenth counts of this indictment, and the first prayer, are drawn in the very words of the third section

of the act in question. And if these counts and this prayer are not sustained, it must be on the ground that the act ought to be interpreted differently from its obvious and literal meaning.

The reason for a strained interpretation, which will have the effect to defeat and repeal this wholesome statute, will scarcely prevail with this court. And the authorities will be found to overthrow such an interpretation; and to support that which is insisted on by the prosecution.

The exact and faithful discharge of the duties which a neutral position imposes upon governments, is among the highest and most important of all national duties. Honour and interest concur in making it especially binding on our own government: and while this conduct has in a very great degree promoted the prosperity of this country; it has placed the policy and character of the nation in a high and elevated position in the estimation of other powers.

In the third circuit and Pennsylvania district, a decision was made upon the words on which this indictment is drawn; and it was there decided, in the case of the United States v. Guinet, 2 Dall. 321, "that the converting a ship from her original destination, with intent to commit hostilities; or, in other words, converting a merchant ship into a vessel of war, must be deemed an original outfit, for the act would otherwise become nugatory and inoperative. It is the conversion from her peaceable use to the warlike purpose, that constitutes the offence." And in this case far less advance towards arming was made, than in the case of the Bolivar. Besides, that the privateer "*Les Jameaux*" never actually proceeded on a cruise, and yet Guinet was convicted. Whereas, in the case at bar, the Bolivar, having actually performed her cruise and made captures of vessels and property of nations with whom the United States were at peace; no room is left for doubting the object of her outfit in the port of Baltimore.

In the case of Needham et al., Peters's C. C. Rep. 487, the same principle was decided.

Cited, also, The United States v. Glass, 3 Wash. C. C. Rep. 65; Kent's Commentaries, 1 vol. 114.

The decisions of this court on the acts prohibiting the slave trade, furnish cases strikingly analogous to the one now under argument.

The expressions used in these acts seem, indeed, to require a more complete development and fulfilment of intention, than the neutrality acts. In the last slave trade act, which passed at the same session as the act upon which this indictment is framed, it is provided, that "if any ship or vessel shall be built, fitted out, equipped, laden, or otherwise prepared, for the purpose of procuring any negro," &c. "such ship," &c. "shall be forfeited." The Emily and Caroline, 9 Wheat. 388; The Plattsburgh, 10 Wheat. 141; The United States v. Goodin, 12 Wheat. 171, 173; The Alexander, 3 Mason, 177; 1 Dodson, 81, were cited.

Mr Chief Justice Marshall says, in giving the opinion of this court, in 5 Wheat. 95, "that although penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which these words in their ordinary acceptation, or in the sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ; where there is no ambiguity in the words, there is no room for construction." Cited, also, 2 Peters, 662, opinion of Mr Justice Story.

In support of the *second* point, it was insisted, that the *intention* coupled with acts *tending* to the accomplishment of the object constitutes the offence, under this statute. For no otherwise could our neutral relations be preserved with nations belligerent towards each other. And in the description of the offence, it differs from many common law offences, such as robbery, murder, &c. And it is not necessary the criminal intent should be accomplished in order to subject the party to conviction and punishment.

As analogous, see the cases in larceny, where carrying away is essential to the offence. Arch. Pl. & Ev. 127, and the authorities there cited; and 2 Russell's Cr. L. 1034; where, among other similar decisions, the twelve judges of England held, "that the removal of a parcel from the head to the tail of a wagon, with intent to steal it, was a sufficient asportation to constitute larceny."

In favour of the *third* point, it was contended, that the acts

given in evidence in this case, so far consummated the offence, that no *locus penitentiæ* remained for the traverser, after leaving the port of Baltimore.

The criminal intent, and the acts consequent thereon, have been conjoined in this case, so that there can be neither a divorce nor a purification by a possible, or even a probable failure of continued and successful support.

All human enterprises are subject to contingencies. The death of the actors, the shipwreck of the vessel, &c. are among the casualties to which every maritime adventure is exposed. These may be supposed as much to enter into the calculation of those who engage in such adventures, as the uncertainty about the requisite funds influenced the mind of the traverser in this case.

If the traverser was innocent, because his guilty enterprise might have been defeated or would have been defeated, if the requisite funds had been withheld; how can any one ever be guilty, since some contingencies must be inseparable from every enterprise ?

Here, unfortunately for the traverser's case; and what illustrates the extravagance of this part of the defence; the contingency turned up favourably for the adventure. And that which commenced in Baltimore was uninterruptedly prosecuted to the close of a successful cruise. Cited 2 East's P. C. 557; 2 Russell's C. L. 991, 1036.

In support of the *fourth* point, the counsel for the United States contended:—

That the word *people* was descriptive of an independent government, acknowledged by the United States, as the word is used in this act.

This word has no technical meaning, for which it invariably stands; and to which courts are obliged, as in technical words, always to annex the same ideas, as e. g. the words *felonious*, *traitorous*, &c. Nor is this word used in this act in opposition, or made to have a more limited meaning than ordinary, by reason of being placed in connexion with other words, by which its general and usual meaning could be affected.

There is nothing in the context here to indicate the legislative intention, that this word was to be understood in any other than its ordinary or vernacular sense.

[United States v. Quincy.]

If there be any thing remarkable in the use made of the word *people*, in this government and country it is in its enlarged, rather than its restricted sense. And it cannot be shown, by examples, that congress ever use it in a narrow interpretation.

The largest state in the confederation uses the word as descriptive of its corporate character: "The people of New York."

But the meaning of this word must be ascertained by reference to standard authorities; and Johnson, Crabbe's Synonymes, were referred to.

The traverser's counsel,—in asking the court to support his *fourth* prayer, upon the ground that the "provinces of Rio de la Plata" were not a people, because they had been acknowledged by the government of the United States, thereby to overthrow this indictment,—makes a demand, founded only on a gratuitous hypothesis, and deriving no support, either from authority or popular usage.

A wholesome rule for the construction of words used in criminal as well as in civil cases, will be found in 1 Chitty, C. L. 172, laid down by lord Ellenborough. "Except in particular cases, where precise technical expressions are required to be used, there is no rule that other words shall be be employed than such as are in ordinary use, or that in indictments or other pleadings a different sense is to be put upon them, than what they bear in ordinary acceptation," &c.

Mr Wirt for the defendant. The only two counts in the indictment for the consideration of the court, are the twelfth and thirteenth; which are founded on the act of congress of 1818, for the punishment of certain crimes. The difference between the counts is in the manner of laying the intent charged to the defendant; the twelfth charges that the defendant with the intent that such vessel *be* employed; the thirteenth, with intent that such vessel *should be* employed.

The prayers of the traverser are founded on the evidence; and they called upon the court to say, whether, on the hypothesis that the jury should believe certain facts which his counsel considered as fairly deducible from the evidence, there had been any violation of the statute on which the indictment is founded.

[United States v. Quincy.]

The statute is one of a peculiar character, growing out of peculiar circumstances, and directed to a peculiar object connected with our neutral rights, on the one hand, and some neutral obligations on the other, which distinguish it from the slave act, and the other acts of congress with which the argument for the United States has sought to confound it. It demands a construction of its own; which it is for the first time to receive in this court.

The course of argument proper to be pursued, is, first, to examine the act upon its own construction; and, second, to show the substantial difference between its provisions, and those of the slave and other acts with which it has been so confounded.

1. To examine the act on its own construction.

The object of all construction is to arrive at the intention of the legislature. The direct mode of doing this, is by looking at the language of the law; but there are other auxiliary modes of arriving at this intention, to which courts also resort for the purpose. One of the most familiar rules for interpreting statutes is to refer to the old law, the mischief and the remedy—that is, to look to the history of the act; the cause which produced it; and the precise object which it was intended to attain. Preston v. Browden, 1 Wheaton.

For this salutary purpose, and with this legitimate object, the court will permit a reference to the history and peculiar circumstances which produced the act of congress now under consideration.

This act, as is well known to the court, is only a transcript of the act of 1794, so far as this prosecution is concerned. The act of 1794 was produced by an attempt on the part of M. Genet, the minister of France, to take advantage of the intense sympathies of this country in behalf of revolutionary France, to involve the United States in the war between that country and Great Britain, and the powers allied with her against France.

This was the mischief which produced the statute; and it is necessary that the court should have a precise view of this mischief, in order to measure the corresponding remedy in the statute. They are referred for the circumstances under which the statute was passed, to 5 Marshall's Life of Washington,

Vol. VI.—3 H

409, 10, 11; 427, 8; 430,    2, 3; 441, 2, 3.    The Message of the President, Dec. 3, 1793, 1 State Papers, 39, 40.    Proclamation of Neutrality, 1 State Papers, 44, 5, 6.

All that was required by the government, and the whole purpose of the law, was to preserve our neutral relations, as enjoined by the law of nations; and as the rules and regulations which had been prescribed by President Washington in the proclamation, had been declared to go all the length of our neutral obligations; why should it be supposed that congress intended to go farther, to the unnecessary and extreme prejudice of the American trade?

The mischief had been, the arming and equipping vessels in our ports, and sallying out thence in warlike array to cruise and commit hostilities on foreign nations, with which we were at peace: that was the mischief; and why should the remedy be more extensive?    It was declared in the instructions, that a vessel whose equipments were so equivocal as to be applicable either to commerce or war, was not a proper object of seizure or molestation.    No obligation of neutrality required us to disturb her; while a just regard to the rights of neutral trade, required that she should be left at liberty to pursue her own course, free from molestation.

It is now insisted, on the part of the traverser in this case, that the act under consideration, with this light of its history collected upon it; is manifestly intended to cover no more ground than the executive rules and regulations, which have been referred to.

Having thus brought the history of the act to aid in its construction, the rule that penal statutes shall be interpreted strictly, is invoked to aid in the further consideration of the application of the law to the case made out by the United States on the testimony.

A careful scrutiny of the language of this act, following, as it did, close on the proclamation of President Washington, and adverting to the views and purposes of its enactment, as shown by its history; will satisfy the court that the position assumed for the traverser is fully sustained.    The offence to be punished was the fitting out *and* arming any ship or vessel within the ports of the United States, intended to be employed in hostilities against the subjects of any foreign state, in amity with us.

The meaning of the terms *fitting out and arming* is, that the vessel shall be both fitted out *and armed;* and to be so fitted out and armed, as to be placed in a condition to commit hostilities. The whole of the purpose of the law was this, and the vessel was to be *completely* fitted out and armed in our own ports, and was to be put in a condition, and with a capacity to commit hostilities immediately. Nothing else, and nothing less than this was the purpose of the law.

Between the *attempt* to fit out and arm, and the fitting out and arming, there is a wide and important difference. To fit out and arm is to do the thing completely; to attempt to fit out and arm means that the party has begun it, but has been prevented accomplishing the purpose by the interference of the government. He has all the guilt of the intention, because his intention was to fit out and arm completely in our ports, in violation of the act. It is therefore incumbent on the prosecution to prove that the object of the traverser was to fit out and arm completely; and in all respects to place in a state for immediate hostilities, the vessel referred to in the indictment.

The argument submitted to the court is, that the third section of the act on which the indictment is founded makes the offence to consist in *fitting out and arming,* which is an entire act; and requires the vessel to be placed in a posture for war, in a condition to commit immediate hostilities, before the offence is completed; such being the only rational meaning of the words of the statute. That if the indictment charges the *attempt,* the charge must not be of an attempt to fit out merely, but of an attempt to *fit out and arm;* that if it charge a procurement, the charge must not be that the accused procured the vessel to be fitted out merely, but that he procured her to be fitted out and armed. In these three descriptions the law is looking at the *prime actor,* for he is described as the person who *fits out and arms;* or attempts to fit out and arm; or procures to be fitted out and armed: he is the actor, or the procurer.

With regard to the principal or prime actor, it is not said if he *knowingly* does the thing; for knowledge is involved in the very description of the offence; but the language of the law as to those who were concerned in furnishing any of the materials is different; this must have been done *knowingly.*

With respect to those persons their participation is manifestly of an accessorial character: they are not indeed called accessories, but the language in which the agency is described, construed with that in which the operations of the principal are described; manifest that the legislature was looking at them in an accessorial light. There is, then, in a fair construction of the law, a principal in the offence, and an accessory. But the offence must have been committed; there must have been a fitting out *and* arming, or an *attempt* to fit out and arm, or the principal actor has been guilty of no offence; and it could not have been intended to punish the secondary or accessorial actor, if the principal actor has not been guilty of an offence. This would be the case, if to attempt to fit out, not being an offence, any one had, knowingly, furnished articles to the vessel to be used for that purpose: and yet, if before the complete fitting out *and arming had been accomplished,* the vessel had been seized, and this consummation prevented, the prime actor would not have been indictable under the law. Thus the part of a transaction becomes a crime in one citizen, while the whole of it is not a crime in another. The construction on the other side is, that the law meant to punish, not merely the consummation of the act, the fitting out and arming, but every step that is taken towards it; so that the *fitting out,* per se, becomes an offence, is a crime, *without arming.* But if this had been the intention of congress the copulation *and* would have found no place in the description: the language of the law would have been "fit out *or* arm," and attempt to fit out *or* arm.

The following cases were cited and commented upon, 1 Wheat. 121; 5 Wheat. 76, 94; 1 Gallison, 114; 1 Paine's C. C. Rep. 32; 2 Wheat. 119; 3 Dallas, 328; the case of Smith and Ogden, 240; Peters's C. C. Rep. 487; 9 Wheat. 389; 10 Wheat. 141; 12 Wheat. 472.

The intent charged against a defendant under the act should be a fixed and positive intent, not in any manner contingent. The vessel in this case was in a condition to be considered as going out as a commercial vessel—she had no crew for war—no muskets—no ammunition. The offence must be consummated within the United States, and the intent is not to be collected from what occurred afterwards.

The evidence shows, that until the vessel arrived at St Thomas the purpose of privateering was uncertain. It depended for its accomplishment on the receipt of funds there, and for some time this was uncertain. If the vessel had been sold on her arrival in the West Indies, most certainly the defendant could not be found guilty. The intention in cases of larceny is not like this; in those cases, where a slight asportation has taken place, it is sufficient to constitute the offence. But there the act is complete by such removal.

The objection to calling the government of Rio de la Plata "a people" is purely technical, growing out of the case of Gelston v. Hoyt. This related to the situation of Piteon and Christophe in St Domingo; and the court, in that case, said neither could be considered a state. The word *people* applies to a community in the course of revolution, and not yet settled down. But this was not the situation of Buenos Ayres. It was a state, and should have been so described. The object of the law was to include political communities of every denomination. The court cannot know but that there may be a people called Buenos Ayres; a reference to particulars would not cure the defect. Buenos Ayres being a state, should have been so denominated.

Mr Williams, in reply.

The Bolivar did not sail from the United States as a merchant vessel, for she had no cargo; nor was there ever produced any account of sales of an outward cargo. She carried out nothing but provisions for a privateer's crew, and munitions of war. The whole invoice cost only six hundred and eighty-seven dollars and eighty-one cents; whereas she was advertised by the traverser to be a vessel capable of carrying from four to five hundred barrels.

At the time when the first neutrality act was passed (1794), the unjustifiable acts consisted in not only fitting out, but also in arming; and therefore, this description of the offence in the act, as well as in the correspondence of the executive department, becomes the most prominent. But the act would have been soon found to be wholly inefficient, if more ample provisions had not been enacted. If, in *Genet's* time, he had set on foot the fitting out of privateers from this country, to be

armed in the West Indies, can it be doubted that our government would have denounced this practice as contrary to our neutrality and the laws of nations?

The case in 2 Wheaton, relating to the transportation of oxen across the line, favours our construction. *There* it was attempted, for the United States, to bring a case within the operation of a penal law, which the letter of the law did not cover. *Here* the indictment, and the act on which it is drawn, comprehend, in their letter and spirit, the very case of the traverser.

The fourth class of offences in the third section, is not confined to *accessorial* participators, but is calculated and intended to comprehend all parties concerned in fitting out *or* in arming. The argument on the part of the traverser requires words to be interpolated into the law; and contradicts the rule, that an indictment, drawn in the words of the act, is sufficient. For if the arming, as well as fitting out, must be proved, so also ought it to be averred in the indictment.

The slave trade acts are, manifestly, analogous to the neutrality acts; and the mischiefs of the former trade are not greater than those which flow from violating the latter acts. For to the lawless practice of privateering, may be ascribed the growing prevalence of piracy.

Mr Justice THOMPSON delivered the opinion of the Court.

This case comes up from the circuit court of the United States for the Maryland district, on a division of opinion of the judges, upon certain instructions prayed for to the jury.

The indictment upon which the defendant was put upon his trial, contains a number of counts, to which the testimony did not apply, and which are not now drawn in question. The twelfth and thirteenth are the only counts to which the evidence applied; and the offence charged in each of these is substantially the same; to wit, that the said John D. Quincy, on the 31st day of December 1828, at the district of Maryland, &c. with force and arms, was knowingly concerned in the fitting out of a certain vessel called the Bolivar, otherwise called Las Damas Argentinas, with intent that such vessel should be employed in the service of a foreign people, that is to say, in the service of the United Provinces of Rio de la Plata, to com-

mit hostilities against the subjects of a foreign prince; that is to say, against the subjects of his imperial majesty, the constitutional emperor and perpetual defender of Brazil, with whom the United States then were, and still are at peace, against the form of the act of congress in such case made and provided.

The act of congress under which the indictment was found, 6th vol. Laws U. S. 321, sect. 3, declares, " that if any person shall, within the limits of the United States, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out, or arming of any ship or vessel, with intent that such ship or vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people with whom the United States are at peace, &c. every person so offending, shall be deemed guilty of a high misdemeanour, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years, &c.

The testimony being closed, several prayers, both on the part of the United States and of the defendant, were presented to the court for their opinion and direction to the jury; and upon which the opinions of the judges were opposed, and which will now be noticed in the order in which they were made.

On the part of the defendant the court was requested to charge the jury, that if they believe that when the Bolivar left Baltimore, and when she arrived at St Thomas, and during the voyage from Baltimore to St Thomas, she was not armed, or at all prepared for war, or in a condition to commit hostilities, the verdict must be for the defendant.

The prayer on the part of the United States upon this part of the case, was, in substance, that if the jury find from the evidence that the defendant was, within the district of Maryland, knowingly concerned in the fitting out the privateer Bolivar, with intent that she should be employed in the manner alleged in the indictment, then the defendant was guilty of the offence charged against him, although the jury should find that the equipments of the said privateer were not complete within the United States, and that the cruise did not

actually commence until men were recruited, and further equipments were made at the island of St Thomas in the West Indies.

The instruction which ought to be given to the jury under these prayers involves the construction of the act of congress, touching the extent to which the preparation of the vessel for cruising or committing hostilities must be carried before she leaves the limits of the United States, in order to bring the case within the act.

On the part of the defendant it is contended, that the vessel must be fitted out *and* armed, if not complete, so far at least as to be prepared for war, or in a condition to commit hostilities. We do not think this is the true construction of the act. It has been argued that although the offence created by the act is a misdemeanour, and there cannot, legally speaking, be principal and accessory, yet the act evidently contemplates two distinct classes of offenders. The principal actors who are directly engaged in preparing the vessel, and another class who, though not the chief actors, are in some way concerned in the preparation.

The act in this respect may not be drawn with very great perspicuity. But should the view taken of it by the defendant's counsel be deemed correct (which, however; we do not admit), it is not perceived how it can affect the present case. For the indictment, according to this construction, places the defendant in the secondary class of offenders. He is only charged with being knowingly concerned in the fitting out the vessel, with intent that she should be employed, &c. To bring him within the words of the act, it is not necessary to charge him with being concerned in fitting out *and* arming. The words of the act are, fitting out *or* arming. Either will constitute the offence. But it is said such fitting out must be of a vessel armed, and in a condition to commit hostilities, otherwise the minor actor may be guilty when the greater would not. For as to the latter there must be a fitting out *and* arming in order to bring him within the law. If this construction of the act be well founded, the indictment ought to charge, that the defendant was concerned in fitting out the Bolivar, *being a vessel fitted out and armed,* &c. But this, we apprehend, is not required. It would be going beyond

the plain meaning of the words used in defining the offence. It is sufficient if the indictment charges the offence in the words of the act; and it cannot be necessary to prove what is not charged. It is true, that with respect to those who have been denominated at the bar the chief actors, the law would seem to make it necessary that they should be charged with fitting out *and* arming. These words may require that both should concur; and the vessel be put in a condition to commit hostilities, in order to bring her within the law. But an *attempt* to fit out *and* arm is made an offence. This is certainly doing something short of a complete fitting out and arming. To attempt to do an act does not, either in law or in common parlance, imply a completion of the act, or any definite progress towards it. Any effort or endeavour to effect it will satisfy the terms of the law.

This varied phraseology in the law, was probably employed with a view to embrace all persons of every description who might be engaged, directly or indirectly, in preparing vessels with intent that they should be employed in committing hostilities against any powers with whom the United States were at peace. Different degrees of criminality will necessarily attach to persons thus engaged. Hence the great latitude given to the courts in affixing the punishment, viz. a fine not more than ten thousand dollars, and imprisonment not more than three years.

We are accordingly of opinion, that it is not necessary that the jury should believe or find that the Bolivar, when she left Baltimore, and when she arrived at St Thomas, and during the voyage from Baltimore to St Thomas, was armed, or in a condition to commit hostilities, in order to find the defendant guilty of the offence charged in the indictment.

The first instruction therefore prayed on the part of the defendant must be denied, and that on the part of the United States given.

The second and third instructions asked on the part of the defendant, were:

That if the jury believe, that when the Bolivar was fitted and equipped at Baltimore, the owner and equipper intended to go to the West Indies in search of funds, with which to arm and equip the said vessel, and had *no present intention*

of using or employing the said vessel as a privateer, but intended, when he equipped her, to go to the West Indies, to endeavour to raise funds to prepare her for a cruise; then the defendant is not guilty.

Or, if the jury believe, that when the Bolivar was equipped at Baltimore, and when she left the United States, the equipper *had no fixed intention to employ* her as a privateer, but had a wish so to employ her, the fulfilment of which wish depended on his ability to obtain funds in the West Indies, for the purpose of arming and preparing her for war; then the defendant is not guilty.

We think these instructions ought to be given. The offence consists principally in the intention with which the preparations were made. These preparations, according to the very terms of the act, must be made within the limits of the United States; and it is equally necessary that the intention with respect to the employment of the vessel should be formed before she leaves the United States. And this must be a fixed intention; not conditional or contingent, depending on some future arrangements. This intention is a question belonging exclusively to the jury to decide. It is the material point on which the legality or criminality of the act must turn; and decides whether the adventure is of a commercial or warlike character.

The law does not prohibit armed vessels belonging to citizens of the United States from sailing out of our ports; it only requires the owners to give security (as was done in the present case) that such vessels shall not be employed by them to commit hostilities against foreign powers at peace with the United States.

The collectors are not authorised to detain vessels, although manifestly built for warlike purposes, and about to depart from the United States, unless circumstances shall render it probable, that such vessels are intended to be employed by the owners to commit hostilities against some foreign power, at peace with the United States.

All the latitude, therefore, necessary for commercial purposes, is given to our citizens; and they are restrained only from such acts as are calculated to involve the country in war.

The second and third instructions asked on the part of the

United States ought also to be given. For if the jury shall find (as the instructions assume) that the defendant was knowingly concerned in fitting out the Bolivar within the United States, with the intent that she should be employed as set forth in the indictment, that intention being defeated by what might afterwards take place in the West Indies, would not purge the offence which was previously consummated. It is not necessary that the design or intention should be carried into execution in order to constitute the offence.

The last instruction or opinion asked on the part of the defendant was:

That according to the evidence in the cause, the United Provinces of Rio de la Plata is, and was at the time of the offence alleged in the indictment, a government acknowledged by the United States, and thus was a *state*, and not a *people* within the meaning of the act of congress under which the defendant is indicted; the word *people* in that act being intended to describe communities under an existing government not recognized by the United States; and that the indictment therefore cannot be supported on this evidence.

The indictment charges that the defendant was concerned in fitting out the Bolivar, with intent that she should be employed in the service of a foreign *people;* that is to say, in the service of the United Provinces of Rio de la Plata. It was in evidence, that the United Provinces of Rio de la Plata had been regularly acknowledged as an independent nation by the executive department of the government of the United States, before the year 1827. And therefore it is argued that the word *people* is not properly applicable to that nation or power.

The objection is one purely technical, and we think not well founded. The word *people*, as here used, is merely descriptive of the power in whose service the vessel was intended to be employed: and it is one of the denominations applied by the act of congress to a foreign power. The words are, " in the service of any foreign prince or state, or of any colony, district or *people*." The application of the word people is rendered sufficiently certain by what follows under the videlicet, " that is to say, the United Provinces of Rio de la Plata." This particularises that which by the word *peo-*

*ple* is left too general. The descriptions are no way repugnant or inconsistent with each other, and may well stand together. That which comes under the videlicet, only serves to explain what is doubtful and obscure in the word *people*.

This instruction must therefore be denied, and the one asked on the part of the United States, viz. that the indictment is sufficient in law, must be given.

These answers must accordingly be certified to the circuit court.


This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and on the points and questions on which the judges of the said circuit court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of congress in such case made and provided, and was argued by counsel; on consideration whereof, it is the opinion of this Court,

1. That it is not necessary that the jury should believe or find that the Bolivar, when she left Baltimore, and when she arrived at St Thomas, and during the voyage from Baltimore to St Thomas, was armed, or in a condition to commit hostilities, in order to find the defendant guilty of the offence charged in the indictment. Therefore, the first instruction prayed for on the part of the defendant, must be denied, and that on the part of the United States given.

2. That the second and third instructions asked for on the part of the defendant should be given.

3. That the second and third instructions asked for on the part of the United States should also be given.

4. That the fourth instruction asked for on the part of the defendant must be denied, and the one asked on the part of the United States, viz. that the indictment is sufficient in law, must be given. It is therefore ordered and adjudged by this court that it be certified to the said circuit court:

1. That it is not necessary that the jury should believe or find that the Bolivar, when she left Baltimore, and when she arrived at St Thomas, and during the voyage from Baltimore to St Thomas, was armed, or in a condition to commit hostili-

ties, in order to find the defendant guilty of the offence charged in the indictment. Therefore, the first instruction prayed on the part of the defendant must be denied, and that on the part of the United States given.

2. That the second and third instructions asked for on the part of the defendant should be given.

3. That the second and third instructions asked for on the part of the United States should also be given.

4. That the fourth instruction asked for on the part of the defendant must be denied; and the one asked on the part of the United States, viz. that the indictment is sufficient in law, must be given.