## THE CITY OF MEXICO.

*(District Court, S. D. Florida.    April 19, 1886.)*

1. PRIZE—LIBEL—WAR.
    To sustain a libel in prize, a state of war must exist. A vessel captured for engaging in piracy becomes a prize on account of the universal war presumed to have been declared by the pirate against commerce and human kind at large.
2. SAME—TWO LIBELS—PRIZE—FORFEITURE
    Where two libels have been filed by the United States against the same vessel, the one in prize, and the other for forfeiture under section 5283, Rev. St., the government cannot be required to elect to proceed upon one of the two, and abandon the other.
3. SAME—"FURNISHING" AND "FITTING OUT" VESSEL.
    The terms "furnishing" and "fitting" have no legal or technical meaning which requires a construction different from the ordinary acceptation in maritime and commercial parlance.
4. SAME—WHAT CONSTITUTES OFFENSE.
    It is not necessary, to constitute an offense under that section, that the vessel should be armed or manned for the purpose of committing hostilities before she leaves the United States, if it is the intention that she should be so fitted subsequently; so there need be no evidence of such arming or manning.
5. SAME—FORFEITURE DECLARED.
    The facts and circumstances of this case considered, and decree of forfeiture granted.

Heard upon two libels, the one in prize, the other for forfeiture for violation of section 5283, Rev. St.

*Livingston W. Bethel,* U. S. Atty., and *James Parker,* for the United States.

The United States cannot be required to elect one proceeding, and abandon the other. The vessel, if a prize, belongs half to the captors, and half to the United States. If forfeited under section 5283, the informers have a right to a moiety. Both captors and informers may claim, therefore, to have the question of prize or forfeiture determined; and the government cannot, by electing one procedure, bar the right of those claiming under the other.

If any one proceeding (say in prize) were now pending, and it should appear that it was not a case of prize, but one of violation of any law of the United States involving fine or forfeiture, it would be the duty of this court to dismiss the libel for prize; but also to permit a new libel to be filed for forfeiture or fine, (as the case may be,) and *vice versa. U. S. v. Weed*, 5 Wall. 62; *The Watchful*, 6 Wall. 91; *Attorney General* v. *Appleby*, 3 Austr. 863.

To warrant a condemnation it must appear (*a*) that she was fitted out, furnished, or armed, (*b*) within the United States, (*c*) with intent that she should be employed to cruise or commit hostilities (*d*) against a people with whom the United States are, at the time of the fitting out, at peace.

It is not necessary that the vessel should be armed, or in a condition to commit hostilities, at the time she leaves the United States, as well as fitted out. Merely to attempt, within the United States, to do either, is what the statute prohibits. *U. S.* v. *Quincy*, 6 Pet. 445; *U. S.* v. *Rand*, 17 Fed. Rep. 142; *The Meteor*, Amer. Law Rec. 401.

The guilt or innocence of the owner has nothing to do with the guilt of the vessel. *U. S.* v. *The Malek Adhel*, 2 How. 233.

Proof such as would be required to convict an individual of an offense against the law is not required in order to forfeit a vessel. *U. S.* v. *Guinet*, 2 Dall. 321; *The Kate*, U. S. Dist. Court of N. Y. 1860; S. C. reported as *The Slavers*, 2 Wall. 350–403.

It is not necessary that any one should be convicted of any of the offenses named in the statute in order that the vessel should be condemned. *The Meteor* and *The Malek Adhel, supra*. If the vessel is fitted out to any degree, or an attempt is made, within the United States, to fit her out, with hostile intent, she must be condemned. *The May N. Hogan*, 18 Fed. Rep. 534; *U. S.* v. *Two Hundred and Fourteen Boxes Arms*, 20 Fed. Rep. 53; *The City of Mexico*, 24 Fed. Rep. 33; *U. S.* v. *City of Mexico*, 25 Fed. Rep. 924.

*George B. Patterson* and *Wm. W. MacFarland,* for the City of Mexico.

The ship is libeled as a prize of war. If the ground of the libel were for piracy, it would be necessary to proceed on the instance side of the court.

The government, as a suitor, stands exactly on the same level as the private citizen; and, wherever the law affords different remedies, the selection of one is definitive. It follows that, the government having elected to proceed on the prize side of the court, a decision in that proceeding against the government is decisive of the whole question. Waples, Proc. in Rem. § 220, p. 310; Field, Fed. Proc. § 80; Waples, Proc. in Rem. 160; *Welland Canal Co.* v. *Hathaway*, 24 Amer. Dec. 254, and notes; *State* v. *Lewis*, 11 Amer. Dec. 741; *State* v. *Cooper*, 25 Amer. Dec. 490; S. C. 58 Amer. Dec. 249.

In respect to the conclusiveness of the judgment, the form of action is always immaterial if the cause of action is the same. *Gilchrist* v. *Bail*, 34 Amer. Dec. 469; *Agnew* v. *McIllroy*, 48 Amer. Dec. 772; *Coffin* v. *Nott*, 57 Amer. Dec. 537; *Hovey* v. *Furman*, 44 Amer. Dec. 129; *Sheldon* v. *Carpenter*, 55 Amer. Dec. 301; *Rodermund* v. *Clark*, 46 N. Y. 354, (a case directly in point.) To same effect, *Second Nat. Bank* v. *Burt*, 93 N. Y. 233; *Steinbach* v. *Relief Fire Ins. Co.*, 77 N. Y. 498.

In such a case a plaintiff is conclusively bound by his election of remedy. *Duffy* v. *Neale's Adm'r*, Taney, 271; *Allison* v. *Alexander*, 1 Cranch, C. C. 237; *Thibault* v. *De Basavilbaso*, Baldw. 9.

On general principles of maritime law, and their application to present case, counsel for the vessel cited Woolsey, Int. Law; Hall, Int. Law, 4, 5; Phillim. Int. Law, 48; Hall, Int. Law, c. 2, §§ 208–213; Id. § 24, p. 78; Bouv. Law Dict.; Lawr. Wheat. 40 *et seq.;* Halleck, Int. Law, 73 *et seq.;* *U. S.* v. *Quincy*, 6 Pet. 445; *The Burdett*, 9 Pet. 691.

LOCKE, J. The only ground upon which a libel for prize can be sustained is that of a state of war. Prize only relates to or is connected with such a state or condition. A vessel captured for engaging in piratical aggression becomes a prize on account of the state of universal war presumed to have been declared by a pirate against commerce and human kind at large, which requires no reciprocal declaration from any nation. Whether piracy is considered as a name applied only to indiscriminate plundering and robbery, either upon the high seas or upon the coasts where the high seas are used as the basis of operation, where the *animus furandi* is the distinguishing feature, as is expressed and held by President Woolsey, precluding the idea of a revolutionary or political sentiment, or whether there may be acts of piracy committed in following out the direct course of a revolutionary struggle, as is contended by Judge BROWN in the recent case of *The Ambrose Light*, 25 Fed. Rep. 408, there must be some overt act either in committing or attempting some offense against the law of nations, to give a piratical character to a vessel. An intent alone can never determine such a state of warfare as would justify the seizure of a prize. There is in this case nothing that can be characterized as an overt act of piracy or warfare, and the libel for forfeiture as prize must be dismissed.

The second libel is for forfeiture for the violation of a municipal statute embodied in section 5283, Rev. St.

It is claimed in behalf of the respondent that, if one libel is dismissed, such dismissal necessarily precludes an examination of the other, upon the principle of election or choice of action against the thing. But these libels, although against the same vessel, found under peculiar circumstances, are in no way based upon the same cause of action. The libel for prize is founded upon the law of nations, and depends for proof upon the facts of her acts upon the high seas; the libel for forfeiture is for the violation of a municipal statute, and depends upon a set of facts and circumstances entirely different from that of piratical aggression. The offenses charged are separate and distinct, and the cause of action is in nowise the same. In *U. S.* v. *Weed*, 5 Wall. 62, and *The Watchful*, 6 Wall. 91, the same question is directly settled.

The libel for forfeiture alleges that certain persons were knowingly concerned in the furnishing and fitting out of said vessel, with the intent that she should be employed to cruise or commit hostilities against the people of the state of Honduras, with whom the United States is at peace. The peace existing with the state of Honduras may be judicially recognized, and there only remains the questions of knowingly furnishing and fitting out of said vessel, and the intent with which she was fitted out.

The terms "furnishing" and "fitting" have no legal or technical meaning which requires a construction different from the ordinary acceptation in maritime and commercial parlance, which is to supply

with anything necessary or needful. That by the furnishing and fitting out is intended something different from the arming, is not only apparent from the language of the statute, but it has been judicially determined in *U. S.* v. *Quincy*, 6 Pet. 445. This vessel was furnished and fitted out, in the usual acceptation of the terms, provided with the necessary supplies, and put in a condition for proceeding to sea, within the United States. Whether she was well furnished or thoroughly fitted out is not the question, if she was so supplied as to proceed on her way. She was furnished with the ordinary engineers' supplies and stewards' stores, and sailed from New York the twenty-second of December, 1885. What was the intent with which she was fitted out, and either dispatched or taken on her way by the parties in charge, becomes a more important and difficult question, involving conclusions both of law and fact.

Whatever may have been the intention of the legislators regarding the particular class of hostilities they were desired to prevent, all we have to decide from is the language with which they have clothed their ideas, and this is broad enough to include all classes of hostilities. It has been ably argued that unless the vessel is so armed that she herself can be the offending party or thing, or, in other words, carries such an armament as can throw projectiles from her port, or is equipped as a man-of-war or armed vessel, the statute will not apply. The terms "peaceful" and "warlike," "friendly" and "hostile," are thoroughly recognized; and the line so plainly marked between what should be the course and conduct of a vessel engaged in a peaceful commercial venture, and one fitted, prepared, and intended for hostilities, is so distinct and well defined as to permit no mistake, nor require a reference to a judicial decision.

A peaceful act, a peaceful voyage, cannot be a hostile one; nor can acts looking towards war or enmity escape from the general term "hostilities." It is true that vessels may frequently be engaged in transporting troops as passengers, and war material as freight, without themselves having any connection with the actual hostilities contemplated, so that their voyages in no way partake of the nature of hostile acts, nor they be liable to be charged with the commission of hostilities. *The Lafayette* and *Ville le Paris*, cited in Hall, Int. Law, 564. Or where troops, conveyed as passengers only, are landed as such, although bound on a hostile expedition, where all connection and relation existing between them and the vessel are to be terminated at their leaving her side, the question becomes one of more difficulty. But when it is intended that a vessel shall herself be part and portion of a hostile expedition; that she shall carry troops, not for the purpose of making quiet and unopposed landing, and leaving them to take the risk of war subsequently, but making for them, or with them, if found necessary, a forcible and hostile landing; standing ready to put them on shore, or receive them on board defeated; to convey and furnish them with arms, ammunition,

and stores; to act as a base of supplies and operations, ready to assist in committing any hostile acts that can be completed by armed men, she sharing all chances of success or defeat, and under the direct orders and control of the commander of a hostile expedition,—it cannot be admitted that her acts would be anything but hostilities. A vessel is a passive instrument, and is but made the means of success; and it matters but little, in the effect of her hostilities, whether she throw shot and shell from her ports, or dispatch boat-loads of armed men from her gangways.

It has been conclusively determined that it is not necessary that the vessel be armed or manned for the purpose of committing hostilities before leaving the United States, if it is the intention that she should be so fitted subsequently. *U. S. v. Quincy, supra.* So there need be no evidence of such arming or manning.

The intention of parties charged with a crime, when the intent is the gist of the offense, is the most difficult of all matters to prove, and in a vast majority of instances, like the present, can only be shown by a chain of circumstances fitting into each other, against every point of which may be expected the denial of all parties in interest, either positive and direct, or as nearly so as the respect for an oath and the ingenuity of the witness will permit.

This vessel, ostensibly owned by Christian B. Hollander, of New York, sailed December 22, 1885, from New York for Central America, having for cargo about 7,000 bags of corn. She was cleared for Progresso, Blewfields, and Corn island, and had as passengers Gen. Emilio Delgado, Col. Manuel Moray, Mariana Soto, and 17 others, who were going at the expense and in the employ of Gen. Delgado. The master was intrusted with a bill of sale of the vessel to Gen. Delgado, and a power of attorney to execute it at any time. He also had a letter of instructions, directing him that, after he should have discharged his cargo of corn at Progresso, he should receive his orders from Gen. Delgado, who accompanied him, should visit such ports or places, take such cargoes or such passengers from and to such ports or places, as he (Delgado) should direct. Before leaving New York there were several cases of merchandise taken on board; but, after inspection by officers of the custom-house, they, which proved to be a cannon, with carriage, furniture, and ammunition, were taken out, and, when the vessel sailed, left behind. It is testified to directly by a number of the crew that while on the voyage Col. Moray and several of the passengers openly spoke of their plans of the voyage; saying that they were going on an expedition to Honduras, and were to fight; that they were going to receive arms from another vessel, and were going first to capture Ruatan; and that the steam-ship was going to cruise between this island and the main-land to cut off communication. When they reached Progresso, Col. Moray (who next to Gen. Delgado seemed to be in charge of the company) requested the purser or steward to get men, telling him they were to

go to Honduras to fight for Gen. Delgado. They took on board eight passengers at Progresso, who came on Gen. Delgado's account, and spoke of their being soldiers, and showed their wounds and scars. The ship proceeded to Belize, where they took on board 10 or 11 men, also on Gen. Delgado's account, and under his control, one of whom declared himself employed as pilot in Honduras waters, but no cargo. Thence they proceeded to Blewfields, then Corn island, at both of which places they remained some time; several of the party saying that they were waiting for arms and ammunition expected by the steamer Neptune; but finally, she not arriving, they cleared for Kingston, Jamaica, by way of St. Andrews. At the several ports she visited, the authorities forbade the landing of passengers on account of their rumored character and business; and finally at St. Andrews the crew made a formal protest before the consular agent against proceeding further in her, and after a hearing and investigation before the consul, Commander Chester, commanding the United States ship Galena, was advised by him that the circumstances would justify her seizure.

There were found on board, not belonging to them, three flags, blue and white, with five stars, resembling the Honduras flag; bird's-eye views of Ruatan, Truxillo, and other places in Honduras, showing particularly all defenses and fortifications; also maps showing principal cities, towns, and roads; several revolvers; three swords; and in possession of Gen. Delgado a case of surgical instruments and bandages, two sets of field telegraph instruments, 10 half barrels of beef, and 100 barrels of flour, which were claimed as the property of Delgado, and bore the same shipping marks as the cannon and ammunition taken from the vessel before leaving New York. At Blewfields, Gen. Delgado drew $4,000 in silver, part of which has been disbursed for the expenses of the ship. The rest was on board.

These are circumstances connected with the vessel herself and her voyage. Much of the conversations in regard to the future use of the vessel, and the intentions of the parties, has been denied with more or less directness. The defense is that Gen. Delgado held a grant or concession of a large tract of land on the Rio Coco, Nicaragua, and that the expedition was to be one for colonization and agricultural purposes, rather than hostile; that the passengers and parties employed at Merida and Belize were agricultural laborers, and not soldiers; and that their final intended destination was Blewfields; but their not being permitted to land interfered with their plans, and brought about the final suspicious circumstances. Were there no other circumstances connected with the case that bore upon it, perhaps, in the leniency of courts, and the disinclination to enforce forfeitures, such view might be accepted; but there were chains of evidence leading to the City of Mexico from another direction.

It appears in evidence that before the vessel left New York, Mr. Marks, a member of the firm of Straus & Co., the agents of the ves-

sel in that city, and through whom all the business was transacted, procured from Mr. Jex, of the firm of Wm. Jex & Co., who had permanent business relations, and a resident agent at Corn island, a letter introducing Gen. Delgado to their agent, Capt. Nelson, at Corn island; and upon the strength of that letter advised him that they (Straus & Co.) had advised their agents at Kingston to ship to him some goods which they requested him to hold at the disposal of Mr. Delgado for reshipment per City of Mexico or otherwise; and, when confronted by Mr. De Long, of the same firm, regarding this letter, admitted that they had purchased the arms, and shipped them to Kingston, intending they should be landed at Corn island, and explained that it was but a friendly turn to ex-President Soto, who had employed them to purchase the arms and City of Mexico, in which business they only acted as agents. There is an attempted contradiction or denial of a portion of this by Marks; but, in view of his false testimony when first before the commissioner, in which he denied that he knew of Delgado, when the proof is positive that he made application to Mr. Jex for a letter of introduction, and explained that he would not need any money, there can be no question as to which witness to believe. This explains what goods he was to ship to Delgado at Corn island; and why they were not received is explained by the testimony of A. D. Straus, of the same firm, who states that this cannon and ammunition put ashore from the City of Mexico was afterwards shipped by a steamer of the Atlas Line, consigned to order at Kingston, but was returned by another vessel of that line because the government would only allow arms to remain there by special permit. After the return of the arms from Kingston, the next attempt to forward them to the City of Mexico we find undertaken by the Norwegian steamer Fram, chartered by Lord & Austin for 40 days to carry a load of arms and ammunition to deliver to order at St. Andrews, Corn island, or Blewfields, calling at Turks Island on the way out to get some laborers, presumably to take along with the arms. The master of the Fram is not, under the circumstances, to be presumed to know where the arms were going; but one of these laborers, James Bogan, who had been sent ahead to Turks Island by the Santo Domingo, testifies that he was to wait at Turks Island, to be shipped thence on the Fram, and from the Fram to the City of Mexico, where he was to report to Gen. Delgado. He tells the same story in his testimony about the intended attack upon Honduras, with some exaggerations, but with no communication with any of the crew of the City of Mexico, nor any inducement that I can perceive for false swearing. The Fram proceeded to St. Andrews, Corn island, and Blewfields, but in the mean time the City of Mexico had been seized, and was on her way to Key West, and consequently the order to whom the arms and ammunition were consigned was not found, and they were returned and left at Kingston. Before the City of Mexico left New York it was intended to

have goods sent her, to be received at Corn island by Gen. Delgado. If they were not the arms and ammunition, what prevented their being regularly shipped, and why not received? If Gen. Delgado's voyage was to terminate at Blewfields, and he was to proceed from there to Rio Coco, why were his goods shipped to Corn island? If he was, in good faith, attempting to colonize a large tract in Nicaragua, had he not enough influence with the authorities to obtain permission to land at their only sea-port? But one conclusion can be arrived at: the City of Mexico was intended for receiving arms at Corn island, or St. Andrews; and, under the orders of Delgado, was waiting for them, whether they came in the Neptune or some other vessel.

What were the intentions for her future course? Bogan says that he was told they were to make an attack on Honduras. It is urged that Bogan has not been connected with the City of Mexico sufficiently to make his testimony relevant; but I think the combination of circumstances proven shows that he was employed or hired to join her on the expedition, under leaders engaged in the same enterprise; and the declaration of such parties may be considered. The crew of the City of Mexico say that those partially in command of a part of the expedition openly announced the intention to attack Honduras. Although not in Honduras waters, nor to go there on any legitimate voyage, they had employed a party who declared himself to be a Honduras pilot. They had bird's-eye views of the fortifications and places along the coast of Honduras. The whole character of the voyage shows it was not a commercial one. No cargo was taken, no cargo looked for,—only arms and ammunition, which are not the implements of peaceful colonization or agriculture. The arms were not shipped or to be received for sale as a financial speculation. There was no war in that part of the world going on or in contemplation, except what was intended by Gen. Delgado, for whom they were intended.

I can arrive at but one conclusion: that acts of hostility were contemplated and intended at the time of furnishing and fitting out the City of Mexico, in which she was to take an active part, and that it was intended that she should receive arms and ammunition, and, in the language of the statutes, she should commit hostilities.

The decree of forfeiture must follow.