## UNITED STATES v. MURPHY.

### (District Court, D. Delaware.   January 19, 1898.)

### No. 2.

1. NEUTRALITY LAWS—INTERPRETATION.

The broad purpose of section 5286 of the United States Revised Statutes is to prevent complications between this government and foreign powers. It is not the intent of that section in any manner to check or interfere with the commercial activities of citizens of the United States or of others residing within the United States and interested in commercial transactions; but to prevent the use of the soil or waters of the United States as a base from which military expeditions or military enterprises shall be carried on against foreign powers with which the United States is at peace.

2. SAME—PROVIDING MEANS FOR MILITARY ENTERPRISE.

Providing the means of transportation for a military enterprise to be carried on from the United States against Spanish rule in Cuba is, within the meaning of section 5286, preparing the means for such military enterprise to be so carried on, and, if done with knowledge on the part of the person so providing the means of transportation, of the character and purposes of such enterprise, is denounced by the statute.

3. SAME—"MILITARY ENTERPRISE" DEFINED.

Where a number of men, whether few or many, combine and band themselves together. and thereby organize themselves into a body, within the limits of the United States, with a common intent or purpose on their part at the time to proceed in a body to a foreign territory, there to engage in carrying on armed hostilities, either by themselves or in co-operation with other forces, against the territory or dominions of any foreign power with which the United States is at peace, and with such intent or purpose proceed from the limits of the United States on their way to such territory, either provided with arms or implements of war, or intending and expecting and with preparation to secure them during transit, or before reaching the scene of hostilities, all the essential elements of a military enterprise exist within the meaning of section 5286.

4. SAME.

It is not necessary that the men shall be drilled or uniformed or prepared for efficient service, nor that they shall have been organized, according to the tactics, as infantry, artillery or cavalry.   It is sufficient that the military enterprise shall be begun or set on foot within the United States; and it is not necessary that the organization of the body as a military enterprise shall be completed or perfected within the United States.   Nor is it necessary that all of the persons composing the military enterprise shall be brought in personal contact with each other within the limits of the United States; nor that they shall all leave those limits at the same point.   It is sufficient that by previous arrangement or agreement, whether by conversation, correspondence or otherwise, they become combined and organized for the purposes mentioned, and that by concerted action, though proceeding from different portions of this country, they meet at a designated point either on the high seas or within the limits of the United States.

5. SAME—TRANSPORTATION OF MILITARY ENTERPRISE.

A vessel may at the same time be engaged in transporting a military enterprise and also a cargo of arms and munitions of war, and while the transportation of the latter is lawful, the transportation of the former is unlawful, if carried on for the purpose of engaging in armed hostilities against the Spanish government in Cuba.

6. SAME—VENUE.

If a military enterprise within the definition above given was begun or set on foot in the United States for the purpose of committing hostilities in Cuba against the Spanish government in that island, whether in co-operation with the Cuban insurgents, or by itself, although such military enter-

84 F.—39

prise may never have reached the shores of Cuba, and if the defendant prepared, within the District of Delaware, and with knowledge on his part then and there of the unlawful nature of the enterprise, the means of transporting such military enterprise from the high seas off Barnegat, either for the whole or any part of the way to Cuba, he violated section 5286.

7. REASONABLE DOUBT.
　　Reasonable doubt defined.

This was an indictment against Edward Murphy for violation of Rev. St. § 5286.

Lewis C. Vandegrift, U. S. Dist. Atty.

Geo. Gray, Herbert H. Ward, and Andrew C. Gray, for defendant.

BRADFORD, District Judge. Gentlemen of the Jury: The indictment in this case charges Edward Murphy, the defendant, with violating section 5286 of the Revised Statutes of the United States. That section comprises certain provisions of the legislation by congress commonly known as the neutrality laws of the United States. It provides that "every person who, within the territory or jurisdiction of the United States, begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor," &c. The indictment originally contained eight counts, of which six, namely, the first, third, fourth, sixth, seventh and eight were, before you were impaneled, disposed of on demurrer; leaving for present consideration only the remaining counts, namely, the second and fifth. The second count charges that the defendant on or about the fifth day of August, 1896, "did wilfully, knowingly and unlawfully provide the means for a certain other military expedition, to be carried on from within the territory and jurisdiction of the United States, to wit, from the District of Deleware, against the territory and dominions of the King of Spain, a foreign prince, or state, with whom the United States were then and are now at peace, the means provided by the said Edward Murphy being the steamship Laurada, of which he was then and there master, and her crew, of which he was then and there in command and control; the said Edward Murphy remaining master of the said Laurada and in command and control of her crew during the several weeks immediately subsequent to the said fifth day of August, A. D. eighteen hundred and ninety six, during which said last mentioned time the said military expedition was being conveyed and transported by the said steamship Laurada, of which he was master as aforesaid, from within the territory and jurisdiction of the United States, to wit, from the District of Delaware, to and against the island of Cuba, a dominion of the said King of Spain, a foreign prince, or state, with whom the United States were then and are now at peace; contrary to the form of the act of Congress," &c. This count, in short, charges that the defendant wilfully, knowingly and unlawfully, provided the means for a military expedition to be carried on from the District of Delaware to and against the island of

Cuba, a dominion of the King of Spain, with whom the United States then was and still is at peace. A conviction of the defendant under the second count could not be justified in the absence of evidence showing that an expedition, for which he provided the means, was to be carried on from the District of Delaware. No evidence has been adduced that any expedition, military or otherwise, was to be or was carried on from the District of Delaware. You are therefore instructed by the court to render a verdict of not guilty as to the second count.

The fifth count charges that the defendant on the fifth day of August, 1896, "did, within the territory and jurisdiction of the United States, to wit, at the said District of Delaware, wilfully and unlawfully prepare the means for a certain other military enterprise to be carried on from thence against the territory and dominions of a foreign prince, or state, with whom the United States were then and are now at peace, to wit, against the colony and district of Cuba, which said colony and district at the time herein mentioned was and still is a part of the territory and dominions of the King of Spain, the said United States then and there being at peace with the said state and with the said King of Spain; that the said Edward Murphy so prepared the means for such military enterprise in that he, on or about the date last aforesaid, being master of a certain steam vessel known as the 'Laurada' and in command of said vessel and her crew at the District of Delaware aforesaid, did then and there proceed with the said vessel and crew down the Delaware River into the Atlantic ocean and thence northward on the high seas off the coast of New Jersey where the said vessel was met under preconcerted arrangement by a certain steam launch known as the 'Richard K. Fox' containing men, and a certain lighter containing arms and ammunition and towed by a certain steam tug known as the 'Dolphin,' which said men and arms and ammunition were then and there transferred to the said 'Laurada' and thence carried by it to or near to the island of Navassa in the Caribbean sea where the said men and arms and ammunition were transferred from the said 'Laurada' to a certain steam vessel known as the 'Dauntless' and by it landed on the shore of Cuba, the said men acting together under a preconcerted arrangement and he, the said Edward Murphy, well knowing and intending that the said men and arms and ammunition should be so transported and transferred and finally landed on the island of Cuba for the purpose of effecting the said military enterprise as aforesaid and making war upon the territory and dominions of the King of Spain; contrary to the act of Congress," &c. This count charges, in substance, that the defendant on the fifth day of August, 1896, knowingly, wilfully and unlawfully prepared the means within the District of Delaware for a military enterprise to be carried on from the United States against the island of Cuba, a dominion of the King of Spain, with whom the United States then was and still is at peace; the means so prepared being the steam vessel Laurada and her crew. The count does not charge that the defendant began or set on foot a military enterprise, but

that he prepared the means for a military enterprise. In order to justify a verdict of guilty you must be fully satisfied from the evidence in the case that all the necessary ingredients of the alleged offence existed or occurred. It is necessary that it shall appear to your satisfaction that on or about the fifth day of August, 1896, the defendant prepared means; that the defendant prepared such means within the District of Delaware; that the means so prepared were means for a military enterprise to be carried on from the territory or waters of the United States; that such enterprise was to be carried on against the territory or dominions of the King of Spain in the island of Cuba; that the United States was at peace with Spain at the time the defendant so prepared means; and that the defendant knew, at the time he prepared such means, the character and purpose of such enterprise. . The court takes judicial notice and instructs you that at the time of the alleged offence the United States was at peace with Spain; that the island of Cuba was at that time and still is part of the territory or dominions of the King of Spain; that at that time an armed insurrection or rebellion existed in Cuba against the Spanish authority and government in that island, and warlike hostilities were then and there in progress between the Cuban insurgents, on the one hand, and the military forces of the King of Spain, on the other. It appears from uncontradicted evidence in the case, of the effect of which, however, you are the ultimate judges, that the defendant was on the fifth day of August, 1896, the master of the Laurada, and that he then controlled her crew and her movements and thereafter continued in such control until after that vessel left the island of Navassa, after having transferred the men and munitions of war to the steam vessel Dauntless at or near that island. It further appears from the testimony, without contradiction, that on the fifth day of August, 1896, the Laurada with her crew was in the Delaware river opposite the city of Wilmington, and within the District of Delaware, and that about five or six o'clock in the evening of that day the defendant boarded her and assumed control as her master, and thereafter continued to control her crew and her movements as above mentioned.

Providing the means of transportation for a military enterprise to be carried on from the United States against Spanish rule in Cuba is, within the meaning of section 5286 of the Revised Statutes of the United States, under which the defendant has been indicted, preparing the means for such military enterprise to be so carried on, and, if done with knowledge, on the part of the person so providing the means of transportation, of the character and purpose of such enterprise, is denounced by the statute. If you shall be satisfied by the evidence in the case that the men taken on board of the Laurada on the high seas off Barnegat constituted a military enterprise, as hereinafter defined, from the United States against the Spanish authorities in Cuba, and, further, that the defendant, with knowledge of the character and purpose of such enterprise, and with intent to furnish transportation for it, took the Laurada with her crew from Wilmington to the place of transshipment on the high seas off Barnegat,

you should render a verdict of guilty. But unless you should be satisfied from the evidence in the case, beyond reasonable doubt, that all of the requisite ingredients or elements of the alleged offence existed, you should render a verdict of not guilty. The broad purpose of section 5286 is to prevent complications between this government and foreign powers. It is not the intent of that section in any manner to check or interfere with the commercial activities of citizens of the United States or of others residing within the United States and interested in commercial transactions. It is not an offence against the United States to transport arms, ammunition and munitions of war from this country to any foreign country, whether they are to be used in war or not; nor is it an offence against the United States for individuals to leave this country with intent to enlist in foreign military service; nor is it an offence against the United States to transport persons out of this country and land them in foreign countries, although such persons have an intent to enlist in foreign armies; nor is it an offence against the United States to transport from this country persons intending to enlist in foreign armies, and munitions of war, in the same ship. The purpose of the section in question is to prevent the use of the soil or waters of the United States as a base from which military expeditions or military enterprises shall be carried on against foreign powers with which the United States is at peace. What it prohibits is a military expedition or a military enterprise from this country against any foreign power at peace with the United States. It does not prohibit the transportation from this country in the same ship of few or many men whose known intention before leaving our shores is to engage in hostilities against the Spanish forces in Cuba, provided that such men do not constitute a military expedition or a military enterprise against the dominion of the King of Spain in that island. If they go from this country to Cuba merely as individuals and without concert of action between them, although for the purpose of taking part in such hostilities, no crime or offence against the United States attaches to anyone who has provided the means of their transportation with full knowledge, at the time he provided such means, of their purpose in securing such transportation. But if the men so transported are so combined and organized as to constitute a military expedition or a military enterprise against the dominion of the King of Spain in Cuba, the furnishing of the means of transportation with knowledge, on the part of the person furnishing such means, of the character and purpose of such expedition or enterprise, is an offence against the United States punishable under the section in question. A military expedition or a military enterprise may consist of few or many men. Eighteen or twenty four men may compose such an expedition or enterprise as well as eighteen hundred or twenty four hundred. The existence or character of the military expedition or the military enterprise does not require concerted action on the part of a large number of individuals. The defendant, as before stated, is charged in the fifth count, not with preparing the means for a military expedition, but

with preparing the means for a military enterprise. The words "military enterprise" are somewhat broader in meaning than the words "military expedition." Where a number of men, whether few or many, combine and band themselves together, and thereby organize themselves into a body, within the limits of the United States, with a common intent or purpose on their part at the time to proceed in a body to foreign territory, there to engage in carrying on armed hostilities, either by themselves or in co-operation with other forces, against the territory or dominions of any foreign power with which the United States is at peace, and with such intent or purpose proceed from the limits of the United States on their way to such territory, either provided with arms or implements of war, or intending and expecting and with preparation to secure them during transit, or before reaching the scene of hostilities, in such case all the essential elements of a military enterprise exist. It is not necessary that the men shall be drilled or uniformed or prepared for efficient service, nor that they shall have been organized, according to the tactics, as infantry, artillery or cavalry. It is sufficient that the military enterprise shall be begun or set on foot within the United States; and it is not necessary that the organization of the body as a military enterprise shall be completed or perfected within the United States. Nor is it necessary that all of the persons composing the military enterprise should be brought in personal contact with each other within the limits of the United States; nor that they should all leave those limits at the same point. It is sufficient that by previous arrangement or agreement, whether by conversation, correspondence or otherwise, they become combined and organized for the purposes mentioned, and that by concerted action, though proceeding from different portions of this country, they meet at a designated point either on the high seas or within the limits of the United States. Under such circumstances a military enterprise to be carried on from the United States exists within the meaning of the law. [The court here took up and disposed of various instructions prayed for on either side, and proceeded.] I now call your attention, gentlemen, to some of the evidence in the case, of the weight and effect of which, however, you, and not the court, are to judge. On Sunday, the ninth day of August, 1896, the Laurada, the Dolphin, the Richard K. Fox and the Green Point all met together on the high seas some ten or twenty miles off Barnegat. Did these vessels meet accidentally, on the one hand, or, on the other, by prearrangement and in accordance with some plan agreed upon in the United States? Rand, the chief mate of the Laurada, testified that he had a conversation with the defendant in Philadelphia, and indicated upon a chart where the Laurada should go, after leaving Wilmington, and that the point so fixed was on the coast of New Jersey. It appears from the uncontradicted testimony that the Laurada left Wilmington on the fifth day of August, 1896, under the command and control of the defendant and proceeded down to a point at or near Dan Baker shoal in the District of Delaware, where she took on board four surf boats, and then proceeded to sea. There is

no evidence showing that, after leaving the District of Delaware, and before arriving at the point off Barnegat, any communication was received either by the defendant or any person on the Laurada from any outside source. Horton testified that the Richard K. Fox about nine or ten o'clock in the evening of the eighth day of August, 1896, started out to sea from Gardener's Landing, at or near Atlantic City, with a number of men, who, with the exception of the crew of the Fox, did not return; and that John D. Hart who, according to the testimony of Rand, had transferred him, Rand, from the Bermuda to the Laurada, called out to the men who were about starting out on the Fox at the time above mentioned, "Cast off your lines and go to sea and you know the rest." Bruff testified that about the first week in August, 1896, he made a sale of arms and delivered them on the eighth day of August at pier No. 39 East River, New York City; that the sale amounted to about $50,000, and included 2100 Remington rifles, 250 Remington carbines, 250 Manser rifles, 250 carbine slings, 858,000 cartridges of different sizes, 10 sets of pack saddles and harness, a lot of electrical supplies including wire and batteries, 2 Hotchkiss cannon with 500 rounds of cannon ammunition, a quantity of vaseline and glycerine, 12 revolvers, 10 holsters and belts, 200 burlap bags, 6 shovels, 3 pickaxes and 20 bundles, the contents of which the witness did not know, but which had been delivered to him and were by him delivered on the pier mentioned. McAllister testified that he was in the towing and transportation business in August, 1896, and at that time owned the barge Green Point and the tug Dolphin; that a gentleman, known as Mr. Cash, engaged the witness to take some ship stores from pier No. 39, East River, New York City; that he went with the Dolphin, towing the Green Point with this cargo, from the pier named out to sea and reached the place to which he was going between eleven and twelve o'clock on Saturday night, August 8, 1896; that he met at the point of his destination a vessel and put the Green Point alongside of that vessel which he believes to have been the Laurada; and that the cargo was taken from the Green Point and put on board of that vessel. McKillop testified that he was the master of the Dolphin in August, 1896, and was on board of her on the trip testified to by McAllister; that he had a pilot aboard whom he did not know; that the witness did not know who put that pilot on board; that he came aboard at the above mentioned pier; that he knew there was to be a pilot there; that he did not ask the pilot to show him any license; that he got the Green Point at the above mentioned pier and towed her around Sandy Hook, and some distance below that point met the Laurada and the Richard K. Fox; that no signals were exchanged when he met these vessels; that he "just run up and put the barge alongside"; that the pilot gave him information as to the boat which he was to place the Green Point alongside of; and that the cargo carried on the Green Point was transferred to the Laurada. Cowley testified that when the Fox came alongside of the Laurada a gentleman from the former vessel asked the defendant "if he had seen the other boat," and that "at the time they were talking we

sighted this other tow boat and a barge at her stern," which were the Dolphin and the Green Point. You are the sole judges of the weight to be given to all this testimony.

If you are satisfied from the evidence in the case that the men and munitions of war, transferred to the Laurada on the high seas off Barnegat were, pursuant to prearrangement in the United States, forwarded from the United States to the point of such transfer and there so transferred, and that the defendant was a party to such prearrangement and knew of it before he left the District of Delaware on the fifth day of August, 1896, it is for you as reasonable men to determine whether there was or was not a fixed purpose on the part of the parties to such arrangement, for the accomplishment of which the men and munitions of war were so transferred. If you are satisfied that there was a fixed purpose and that the defendant was, before he left the District of Delaware, aware of that purpose, then you are to determine what that purpose was. Was it or not to carry on merely a commercial venture or enterprise? If it was merely to transport arms and munitions of war to be used in Cuba against the Spanish forces, the purpose was lawful, and, while the cargo might have been seized by Spanish cruisers, no offence against the laws of the United States was committed. Unless you are fully satisfied that the transaction in question was not merely a commercial or industrial venture, you should acquit this defendant. And if the men taken on the Laurada off Barnegat were only passengers, although their destination was Cuba and their purpose was either to take part in armed hostilities against the Spanish forces, or, if the men so taken on the Laurada were not a military enterprise, but merely stevedores or men intended to handle the cargo, you should acquit the defendant. But you must bear in mind that a vessel may at the same time be engaged in transporting a military enterprise and also a cargo of arms and munitions of war, and that, while the transportation of the latter is lawful, the transportation of the former is unlawful, if carried on for the purpose of engaging in armed hostilities against the Spanish government in Cuba. The fact that the cargo of arms and munitions of war on the Laurada was in excess of the amount that could be used, in warlike operations, by the men who were transferred to the Laurada off Barnegat is not of itself inconsistent with the existence of a military enterprise on the Laurada; though the existence of such military enterprise must be proved beyond a reasonable doubt. Were or were not the men, so transferred to the Laurada, merely stevedores or persons intended to handle the cargo, legitimately transported as an industrial or commercial venture? This question you are to decide from the evidence in the case. It does not appear from the evidence to whom the shipment of the arms and munitions of war from pier No. 39 East River was consigned; nor does it appear whether any bill of lading accompanied the transaction; nor does it appear that the men who were transferred off Barnegat to the Laurada and who went on that vessel to or near Navassa, returned north after the Laurada discharged her cargo into the Dauntless at or near that island.

What, if any, inferences are to be drawn from these circumstances, or from the testimony relating to the stowaways in the chain locker of the Laurada, are for your determination only.

The burden rests upon the government to satisfy you, beyond a reasonable doubt, that the men transferred to the Laurada off Barnegat were a military enterprise directed against the Spanish government in Cuba. The uncontradicted testimony shows that the Laurada under the command and control of the defendant, after taking on the surf boats within the District of Delaware, proceeded to a point on the high seas off Barnegat and there received from the other vessels, meeting her there, men and munitions of war. There is some variance in the testimony as to the number of men there taken on the Laurada. But whether that number be 18, 20 or 24 is wholly unimportant. Rand, the chief mate of the Laurada, testified that there were 18, and that he could not say that they were all Cubans; that two of them were negroes; that he could not say that the rest were Englishmen; that they talked English; and that some of them were light and some dark. Cowley testified that he could not say positively how many men were transferred to the Laurada from the Fox off Barnegat, but that he learned there were about 20 or 24 of them; that he could not say of what nationality they were, with the exception of one of them whom he had known as a pilot in Cuba; that they were dark complexioned people; and that they spoke a foreign language as far as he knew. Nichols testified that 24 Cubans were transferred at that place from the Fox to the Laurada. Roberts testified that the men so transferred to the Laurada from the Fox "were not more than 16 or something like that"; that he did not know at that time of what nationality the majority of them were, and that he subsequently ascertained that they were Cubans, from having conversation with some of them. The weight and effect of this testimony you are to determine. Rand testified that at the place where the several vessels met off Barnegat he saw a man who, he was told, was General Roloff; that he talked with him on the voyage down to Navassa; that he answered to the name of General Roloff; that there was a man at the place of meeting off Barnegat called Captain by some and Capitan by others; that the men who came with this person called him Capitan; that on the way down to Navassa he saw some large boxes of the cargo which had been transferred to the Laurada off Barnegat opened and small boxes taken out; that at the point of meeting off Barnegat he saw Captain O'Brien of the Bermuda and also a man who was called Colonel Nunez; that Captain O'Brien and the man called Colonel Nunez did not go on the Laurada down to or near Navassa, but that they were both on the Dauntless when the Laurada met her at or near that island; that he was told by the defendant that "we had a certain time to be at Navassa island"; that the Dauntless when met by the Laurada had canvas over her bow and canvas over her stern and something over her smokestack; that while on the Laurada he believed he talked with some of the persons who had been taken on board that vessel off Barnegat about digging trenches; that he knew

"it was something about digging trenches and climbing hills. I told them they wouldn't find that as pleasant as going up eighth avenue, New York;" that he does not think that he said in what place trenches were to be dug; that he did not know, but only had an idea where they were to be dug. It appears from the testimony of Bruff that the arms and munitions of war which were transferred to the Laurada included shovels and pickaxes. Cowley testified- that on the way down to Navassa there was a man on board the Laurada called Capitan who had the men, who were transferred from the Fox to the Laurada off Barnegat, in command; that on the way down to Navassa the witness said to the Cuban pilot, who, according to the testimony, had come on board of the Laurada off Barnegat, "there comes a Spanish man-of-war;" to which he replied that "he didn't care for a Spanish man-of-war, they could whip all the Spanish man-of-war ships"; that the Cuban pilot, after reaching Navassa, told the witness that they were going to Cuba "to fight the Spaniards"; that during the voyage to Navassa the man called Capitan and "those two young fellows who stowed away—before they stowed away, they came to Captain Murphy's room, the chart room, one morning. They spoke English, I was painting the floor. They looked over the chart, the map; and Capitan spoke in a foreign language to these young fellows, and they allowed to Captain Murphy that that was where they wanted to land in Cuba," and that "they pointed it out on the chart." Nichols testified that when the Fox came alongside of the Laurada off Barnegat, the men in the former vessel were hungry, and that the defendant "told me to give them something to eat, and I got a bucket full of coffee and lowered it down on the boat, and a dish of meat and bread and sent it down there;" that "Captain" Sutro came on board the Laurada from the Fox; that General Roloff, Colonel Nunez and the general's valet came in the Dolphin; that some of the men who, according to his testimony, came with Captain Sutro, "went on board the barge and with the crew of the barge, helped to put these boxes and bundles off it on board the Laurada"; that Captain Sutro was in charge of the men who came off the Fox; that a Cuban pilot was among them; that the witness can talk a little in the Cuban language; that after the cargo was discharged from the Green Point into the Laurada Colonel Nunez and Captain O'Brien went in the Fox, and that the Dolphin and Green Point went in another direction, and "we steamed out to sea"; that one day while the Laurada was on her way down to Navassa the witness "went down into the hold and Captain Sutro and his men were down there sorting these boxes, taking things out and getting small ones out of the larger ones. Then he opened one of the lid boxes and it had cartridges in it, and those bundles had machetes and there were rifles in there; and there was something like a cartridge that long (indicating), two of them, in a box; and some saddles. I saw those things"; that the men who had been transferred from the Fox to the Laurada were all under Captain Sutro and General Roloff, and that Roloff was over Sutro; that "the mess-room was right opposite the cabin where the general stayed; and any

time that these men would come where the general was and the general would come out, the men would run away forwards. He didn't want them to stay there. He would tell the captain to keep them where they belonged, he was commanding these men, and the general was commanding the captain;" that the witness "spoke to Ricardo, a little dark Cuban fellow on the Laurada and he said he was going to Cuba to fight the Spaniards." Roberts testified that the man called "Capitan" was in charge of the men who were transferred to the Laurada off Barnegat and that General Roloff was over him; that the Cuban pilot told him, the witness, that the men were going to Cuba to fight the Spaniards.

All this testimony, gentlemen, is for your consideration. It is solely your province to determine its weight and effect. While the court brings to your attention some of the testimony, you are instructed that you are not in the least controlled by anything which has been or shall be stated by the court in relation to the testimony in this case. While it is my duty to call your attention to such portions of the testimony as in the judgment of the court may aid you in arriving at a just verdict, you are to give to the testimony only such weight and effect as you consider it entitled to. The court instructs you that the testimony of Cowley, to the effect that the Cuban pilot after the return of the Dauntless to the Laurada at or near Navassa told him that "they landed men safe in Cuba," is to be treated by you solely as evidence tending to show the purpose and character of the enterprise, and not as evidence of the fact of the landing of men in Cuba. It is unnecessary that the government should prove that a military enterprise should have actually reached the shores of Cuba. If the destination of a military enterprise was that island it is wholly unimportant whether it reached Cuba or not. You will recollect the testimony relating to the transferring of the cargo and men on board of the Laurada to the Dauntless at or near Navassa, and the furnishing there by the Laurada of coal for the use of the Dauntless, and also the testimony relating to the stowaways in the chain locker of the Laurada. It is unnecessary that I should longer detain you by recapitulating that testimony. Was or was not the body of men who were transferred off Barnegat to the Laurada a military enterprise against the Spanish government in Cuba? Were they or not men who had combined and banded themselves together and thereby organized themselves into a body within the limits of the United States with a common intent or purpose on their part at the time, to proceed in a body to Cuba, there to engage in carrying on armed hostilities against the Spanish government there, either by themselves or in co-operation with the Cuban insurgents, and were they or not provided with arms and implements of war which they might use in Cuba as occasion required? If so, they were a military enterprise denounced by section 5286 of the Revised Statutes of the United States. Were or not the men who were conveyed on the Laurada to the Dauntless, and transferred to the Dauntless, free agents, on the one hand, or, on the other, subject to authority of a military character? These questions are for your determination. If you find that the men taken on board the Laurada off Barne-

gat were not a military enterprise from the United States against Spanish rule in Cuba, or, if you have a reasonable doubt whether such was the fact, the defendant must be acquitted. But if you are satisfied beyond a reasonable doubt that these men constituted, within the definition heretofore given to you by the court, a military enterprise from the United States against the authorities of Spain in Cuba, although such enterprise may never have reached the shores of Cuba, the next and final question with which you are confronted is whether or not the defendant, at the time he provided the Laurada and her crew within the District of Delaware as means for the transportation of the unlawful military enterprise, if such you find it to be, had knowledge of its real character. The defendant, admittedly, was in command and control of the Laurada and her movements from the time she left the District of Delaware until after she had transferred her cargo of arms and munitions of war, together with the men taken on board of her off Barnegat, to the Dauntless. You are familiar with the testimony as to occurrences and statements made or happening on the Laurada during her voyage to Navassa. If the men and arms and munitions of war were received by the Laurada off Barnegat in pursuance of a prearranged plan or scheme, it is for you to determine whether or not that plan or scheme, whatever it may have been, was abandoned during the voyage of the Laurada from off Barnegat to Navassa. If you shall be satisfied that such scheme or plan, if any existed, was not so abandoned and that the real nature of the enterprise was apparent to the defendant as well as to the others on board of the Laurada at any time after the Laurada left the high seas off Barnegat and before she finally left Navassa, and that the defendant accepted the situation as a matter of course, without the expression of surprise, remonstrance or protest, it will be for you to determine whether this circumstance would or would not have a tendency to show knowledge on the part of the defendant, before the Laurada left the District of Delaware, of the real nature, character and purpose of the enterprise, and if so, it should be taken with all the other evidence in the case.

If, from all the evidence in the case, you shall be satisfied, beyond a reasonable doubt, that a military enterprise, within the definition given to you by the court, had been begun or set on foot in the United States for the purpose of committing hostilities in Cuba against the Spanish government in that island, whether in co-operation with the Cuban insurgents, or by itself, although such military enterprise may never have reached the shores of Cuba, and that the defendant prepared within the District of Delaware, and with knowledge on his part then and there of the unlawful nature of the enterprise, the means, namely, the Laurada and her crew, of transporting such military enterprise from the high seas off Barnegat, either for the whole or any part of the way to Cuba, you should render a verdict of guilty. If you are not so satisfied, you should render a verdict of not guilty.

The commission of a criminal offence can be shown by circumstantial evidence as well as by direct evidence, provided the circumstances proved, together with reasonable inferences drawn from them, are such as to leave no reasonable doubt in the minds of a jury that

the defendant is guilty. You are to take into consideration all the evidence in this case, whether direct or circumstantial, together with all reasonable inferences to be drawn from that evidence, and, upon the evidence taken as a whole, determine upon your verdict. If that evidence does not satisfy you, beyond a reasonable doubt, that the defendant is guilty of the offence with which he is charged under the fifth count in the indictment, it will be your duty to render a verdict of not guilty. If, however, that evidence does so satisfy you, beyond a reasonable doubt, it will be your duty to render against the defendant a verdict of guilty in manner and form as he stands indicted under the fifth count.

A reasonable doubt is not a doubt created by the ingenuity of counsel or of the jury; nor is it a whimsical, arbitrary or speculative doubt; nor a trivial supposition; nor a mere conjecture or guess; nor is it such a doubt as is born of a merciful inclination to permit the defendant to escape the penalty of the law, nor one permitted by sympathy for him or those dependent upon him. The court charges you that the law presumes the defendant innocent until proven guilty beyond a reasonable doubt. If you can reconcile the evidence before you upon any reasonable hypothesis consistent with the defendant's innocence, you should do so, and in that case find him not guilty. You are further instructed that you cannot find the defendant guilty unless from all the evidence you believe him guilty beyond a reasonable doubt. The court further charges you that a reasonable doubt is a doubt based on reason and which is reasonable in view of all the evidence. If, after an impartial comparison and consideration of all the evidence you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt; but if, after such impartial comparison and consideration of all the evidence you can truthfully say that you have a settled and fixed conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt. The guilt or innocence of the defendant is to be determined by you as intelligent and conscientious men upon the evidence adduced in this case, and upon that alone. No public clamor, no sentiment of hostility or sympathy, no consideration of consequences which may result from your verdict should be permitted in any manner to influence your deliberations. You will well and truly try the traverse joined between the United States of America and Edward Murphy, the defendant, and a true verdict give according to your evidence. The counsel engaged in this case have well and faithfully performed their duty. The court now closes its charge to you. Upon you rests the grave responsibility of deciding this case according to the facts, under the law as laid down to you by the court.