## THE CARONDELET.

## UNITED STATES v. THE CARONDELET et al.

(*District Court, S. D. New York.* February 15, 1889.)

1. NEUTRALITY LAWS—CARRIAGE OF ARMS—COMMERCIAL TRANSACTION.

The steamer C., chartered by the consul of the Dominican government to carry a cargo of arms to Samana, in the Dominican republic, deliverable, as per bill of lading, to the representatives of that government. was seized, with the cargo, for an alleged violation of the neutrality act, (section 5283, Rev. St.,) for being fitted out and armed to aid Hippolyte, who headed one of the warring factions in Hayti, against Legitime, the head of the opposing faction. *Held*, upon proof that the C. was designed only to transport the cargo to Samana. and that the arms were there deliverable to the Dominican government, that both vessel and cargo must be discharged, the transaction being a legitimate, commercial one.

2. SAME—AIDING WARRING FACTIONS.

It having been declared by the president of this country that Hayti is in a state of anarchy, and that Legitime and Hippolyte, with their followers, were regarded as warring factions, neither of whom constituted any responsible government, *semble*, that neither neutral obligations, nor our statute, apply to such a case.

In Admiralty. Seizure for breach of neutrality laws.

This libel was filed on the 6th of February, 1889, to obtain a judgment of condemnation and forfeiture of the steamer Carondelet and her cargo, for alleged violation of section 5283, Rev. St. U. S. The libel charged that the steamer was loaded with cannon, arms, and ammunition, and other material of war, "with intent to enter into the service of a certain district and people of Hayti, to-wit, certain rebels in insurrection against the organized and recognized government of the republic of Hayti, and to commit hostilities against the subjects, citizens, and property of that republic;" and that she was "fitted out and armed within this district with that intent." The steamer was seized by the marshal on the same day. Answers were filed on the 8th of February, denying the alleged grounds of forfeiture, the New York & Texas Steam-Ship Company. by Mallory & Co., their agents, claiming the steamer; and Leoncio Julia, as consul of the Dominican republic, claiming the cargo. The vessel was a freight steamer only, unfitted for warlike purposes. Before seizure she had cleared for Samana, a port of the Dominican republic. She had been chartered by Mr. Julia, as consul, to transport her cargo of arms, to be delivered to the Dominican government at Samana; and bills of lading were delivered by the steamer, making the cargo deliverable there to the representatives of the Dominican government. For the libelant it was claimed that the arms were designed to aid the Hippolyte faction in Hayti, as against Legitime; and that they were not intended to go to Samana. By consent the trial was commenced on the 9th, but on that day, counsel for the government not being in readiness, an adjournment was had until the 12th, and the cause was heard on that and the following day.

*Stephen A. Walker*, U. S. Atty., and *Abram J. Rose*, Asst. U. S. Atty. *McFarland, Boardman & Platt*, for the claimants.

BROWN, J., (*after stating the facts as above.*) Section 5283 of the Revised Statutes, under which the Carondelet and her cargo were seized, provides for the forfeiture of any vessel that, "within the limits of the United States," is "fitted out and armed," or attempted to be fitted out and armed, with the "intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace."

The libel charges the fitting out and arming of this vessel with the intent to be employed "in the service of a district and people of Hayti, to-wit, of certain rebels, to commit hostilities against the subjects, citizens, and property of the recognized government of the republic of Hayti, with which the United States are at peace."

A doubt arises at the threshold whether the statute above cited has any application to a mere struggle between contending factions, neither of which is recognized by our government. The case sought to be proved by the libelants is that the vessel and arms were designed to aid Hippolyte as against Legitime in the struggle for supremacy now going on in Hayti. It is not a case even of an insurrection against a recognized power. In August, 1888, the existing government in Hayti was overthrown, the president being deposed and banished. As stated in President Cleveland's message of December 3, 1888, the country has since then been in a state of anarchy, in which there is a struggle of warring factions, neither of which is recognized by the United States as constituting any responsible government. Section 5283 is designed, in general, to secure our neutrality between foreign belligerent powers. But there can be no obligation of neutrality except towards some recognized state or power, *de jure* or *de facto*. Neutrality presupposes at least two belligerents; and, as respects any recognition of belligerency, *i. e.*, of belligerent rights, the judiciary must follow the executive. To fall within the statute, the vessel must be intended to be employed in the service of one foreign prince, state, colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of another, with which the United States "are at peace." The United States can hardly be said to be "at peace," in the sense of the statute, with a faction which they are unwilling to recognize as a government; nor could the cruising, or committing of hostilities, against such a mere faction well be said to be committing hostilities against the "subjects, citizens, or property of a district or people," within the meaning of the statute. So, on the other hand, a vessel, in entering the service of the opposite faction of Hippolyte, could hardly be said to enter the service of a foreign "prince or state, or of a colony, district, or people," unless our government had recognized Hippolyte's faction as at least constituting a belligerent, which it does not appear to have done. In the view of the president's message, neither

the party of Legitime nor that of Hippolyte constitutes the "Republic of Hayti," or represents the government, or a district, or the people of Hayti.

The words "colony, district, or people" in section 5283, come from the act of April 10, 1818, by which those words were added as an amendment to the act of June 5, 1794. Section 3 of the act of 1794, like the first rule of the Geneva arbitration under the treaty of Washington of 1871, mentions only a state or prince. 3 Whart. Intern. Dig. § 402a. The English foreign enlistment act is much broader. The intent of the amendment of 1818 doubtless was to extend the statute to cases of colonies or districts engaged in revolutionary struggles, many of which were then in progress between Spain and her dependencies. The struggle in Hayti is not for independence, or separation, nor between different districts or people; but between warring "factions" only, so far as our government has recognized them. The statute is a highly criminal and penal one; it is not to be enlarged by construction beyond the fair import of its terms. I do not find it necessary, however, to decide upon this point, as the libel must be dismissed for other reasons.

The Carondelet was not intended "to cruise or commit hostilities" against any one. She was neither fitted, nor adapted, nor intended for such uses. She was chartered by Mr. Julia, the consul of the Dominican government at this port, to carry a cargo of arms and munitions of war to Samana, a Dominican port, for delivery there to the Dominican government. Her charter is in evidence, as well as her bills of lading, which state that the arms are to be so delivered. She has cleared for Samana in the ordinary way. Mr. Julia has testified that the cargo was bought by him for his government, and by its orders. One of the firm of Hartley & Graham, by whom a considerable part of the cargo was supplied, testifies to the same effect; and also that his firm has a running account with the Dominican government, and has been accustomed to sell them arms largely for the past 15 years. These are marks of a simple and legitimate commercial transaction. The consul, as a commercial officer, was an appropriate agent for such a transaction by the Dominican government.

On the other hand, it is said that this is but a false pretense, and a pretext for an indirect mode of aiding Hippolyte against Legitime; that the arms are to be paid for by Hippolyte's agents; that either on the high seas or at Samana the arms are to be transferred to the steamer Madrid, now fitting up for warlike uses at this port, and nearly ready to sail; that the Madrid, thus armed, is to join Hippolyte's forces; and that the Carondelet is a mere tender to this enterprise.

Beyond the fact that the Madrid is now undergoing repair and strengthening for naval uses, the evidence wholly fails to sustain these charges. There is nothing in the evidence that goes beyond mere suspicion, or the possibility that the arms after arrival at Samana may be employed in aid of Hippolyte. If so, it can only be through the direct acts of the Dominican government. Mere suspicion or possibility would be insufficient, even if the consignee were not the Dominican government it-

self. Lawful traffic cannot justly be interfered with upon vague suspicion; much less, vessels and cargoes condemned. Commercial transactions by neutral nations in contraband of war, according to the long-established doctrine of this country, it must be remembered, are as legitimate and free as traffic in any other description of merchandise, subject only to the risk of capture by the belligerents. A vessel, by merely engaging in *bona fide* contraband trade, does not violate the statute, or our neutral obligations, even if the trade be in armed vessels. *The Bermuda*, 3 Wall. 514, 551–555; *The Santissima Trinidad*, 7 Wheat. 283, 340; *The Florida*, 4 Ben. 452; *U. S. v. Two Hundred and Fourteen Boxes Arms*, 20 Fed. Rep. 54; 3 Whart. Intern. Dig. 509–517; *Ex parte Chavasse*, 4 De Gex, J. & S. 655.

If there were reasonable grounds to suspect that the Madrid is not designed to go to Samana, to be delivered there in completion of a contract of sale to the Dominican republic, but to go direct to Hippolyte, taking her armament, by a preconcerted arrangement, from the Carondelet on the high seas, in that case, whether the Carondelet could or could not be refused a clearance under section 5290, the Madrid, according to the cases of *The Meteor* and *The Mary N. Hogan*, 18 Fed. Rep. 538, might be seized and forfeited under section 5283; but not the Carondelet; for the latter, upon the facts assumed, would not be designed "to cruise or commit hostilities" against any one, but only to complete the arming of the Madrid, which is not a ground for forfeiting the Carondelet. She might be captured by the belligerents, but would not come within our statute. There is no evidence, however, of any such design, even as respects the Madrid. According to the evidence, she is to be delivered to the Dominican government at Samana, on payment of the unpaid balance of the purchase price, which is more than half of the cost, including the cost of the alterations.

The suit against the Carondelet, therefore, necessarily fails; and, that failing, the forfeiture of the arms fails also; since the statute forfeits the latter only when the vessel for which they are procured is found liable to forfeiture.

When it appears that the transaction is an official one in behalf of an independent government, with which our own government is at peace, and that government is the *bona fide* consignee at one of its own ports, it must require a very clear case to justify arrest and condemnation, even if it could be lawfully done at all, whatever the ulterior purpose of that government might be. It is no part of the design of our statute to enforce neutrality upon other states. There is no need of any statute of neutrality for such a purpose, nor appropriateness in such an application of it, since every recognized power is presumed to be responsible for what it does, and for what it permits to be done within its own jurisdiction. When the arming is on the high seas, through another vessel, proof that both were dispatched from our ports as parts of a concerted scheme made here, is justly held proof of "an attempt, within the limits of our jurisdiction, to fit out and arm" the vessel with intent to commit hostilities, and hence within the statute. That construction is

necessary to avoid easy and manifest evasions of neutrality; for arming on the high seas is not an act within the limits of any other jurisdiction. No other state has any power, control, or responsibility in the matter; but our own ports become in such cases the real base of hostile operations. It is otherwise when the arming is designed to be in a foreign port, and under the observation, the control, and the responsibility of another government. That is not an attempt here to fit out and arm the vessel, but only an attempt to send her to a foreign port for arming. The statute does not include that, and ought not to be extended to such a case. There is no precedent, and no sufficient reason for it. Still more should a *bona fide* delivery to an independent government be deemed to end the adventure, so far as our merchants are concerned. Subsequent acts, under the authority or permission of that government, are too remote for the operation of our statute. And where such a *bona fide* delivery alone is the design of the owner and shipper, the adventure is commercial only, and there is no violation of section 5283, whether the articles are contraband, or are vessels armed or unarmed. The libel is dismissed.