## THE LAURADA.

### UNITED STATES v. THE LAURADA.

(District Court, D. Delaware. March 1, 1898.)

**1. NEUTRALITY LAWS—CONSTRUCTION.**

While it is not the purpose of our neutrality laws in any manner to check or interfere with the commercial activities of citizens of the United States or of others residing therein and interested in commercial transactions, nor to render unlawful mere commercial ventures in contraband of war, they were designed to prohibit acts and preparations on the soil or waters of the United States, not originating from a due regard for commercial interests, but of a nature distinctively hostile in a material sense to a friendly power, engaged in hostilities, and calculated or tending to involve this country in war, whether an incidental or indirect commercial profit does or does not result from them.

**2. SAME—FITTING OUT AND ARMING VESSEL.**

It is not necessary to a forfeiture of a vessel under section 5283 of the Revised Statutes of the United States that the furnishing, fitting out, or arming of her for the prohibited purpose should be completed within the limits of the United States. It is sufficient that, by prearrangement within the limits of the United States, the vessel having been procured here, the furnishing, fitting out, or arming is to be effected or completed after she has gone beyond those limits.

**3. SAME—INTENT.**

It is necessary to a forfeiture that the intent that a vessel furnished, fitted out, or armed to cruise or commit hostilities against the subjects or property of a foreign prince with whom the United States is at peace, within the meaning of section 5283, shall be formed within the limits of the United States and shall be of a fixed and unconditional nature. Where such intent originates on the high seas beyond the limits of the United States, though on an American vessel which then for the first time is intended to commit such hostilities, no forfeiture accrues under the section.

**4. SAME.**

If a vessel be provided, coaled, and provisioned by her master in the United States, by prearrangement, for the purpose of transporting and landing in Cuba an armed military expedition from the United States against the Spanish government in Cuba, in aid of the Cuban insurgents, quære whether such vessel is furnished or fitted out with intent that she should be employed in the service of the Cuban insurgents to commit hostilities against the subjects or property of Spain, within the meaning of section 5283.

This was a libel of information against the steamer Laurada for violation of the neutrality laws.

Lewis C. Vandegrift, U. S. Dist. Atty.

Gray, Ward & Gray, for the Laurada.

BRADFORD, District Judge. In this case a libel of information was filed on behalf of the United States against the American steamship Laurada, her tackle, apparel and furniture, praying that the same be condemned and declared forfeited for an alleged violation of section 5283 of the Revised Statutes, containing certain provisions of the neutrality laws of the United States. That section is as follows:

"Sec. 5283. Every person who, within the limits of the United States, fits out and arms, or attempts to fit out and arm, or procures to be fitted out and armed, or knowingly is concerned in the furnishing, fitting out, or arming, of any vessel with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or

commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, or who issues or delivers a commission within the territory or jurisdiction of the United States, for any vessel, to the intent that she may be so employed, shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years. And every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores, which may have been procured for the building and equipping thereof, shall be forfeited; one half to the use of the informer and the other half to the use of the United States."

The libel as amended contains sixteen counts, which it is unnecessary here to recite. It is enough to say that, collectively, they are sufficiently comprehensive to allow the government to take advantage of all evidence adduced in the case tending to show a violation of the section in question.

The Laurada, being a vessel of about 900 tons burden, cleared from the port of Baltimore for Philadelphia, February 26, 1897, ostensibly for the purpose of having her boiler repaired in the latter city. Samuel Hughes was master and in command of her when she left Baltimore and continued master and in command of her until after her return from Cuba. On or shortly before the day of her departure from Baltimore she received certain stores, consisting of provisions and ship-chandlery and 200 tons of coal. No other coal was supplied to her until she returned from Cuba. There is no evidence that the Laurada at the time she left Baltimore carried any armament or appliances suitable for hostile naval operations or any other arms or munitions of war. Nor does it appear that there was then any feature either in her construction or equipment suggestive of a purpose that she should engage in hostilities of any kind. On the contrary, she was a merchant vessel specially adapted for the transportation of fruit. She was an old steamer. Her boiler was weak and out of repair, and her steam valves were so adjusted as not to allow her to carry more than 60 pounds pressure. At this pressure her speed was from six to seven knots an hour. After leaving Baltimore the Laurada proceeded to the mouth of the Chesapeake Bay and thence pursued a generally northerly course until she reached a point on the high seas some three or four miles off Cape Henlopen. She arrived at this point either late at night or early in the morning. Here, about four o'clock in the morning, the Laurada was met by a tug boat with two life boats and three surf boats. The tug came alongside and the five boats were hoisted on board of the Laurada and thereupon Hughes ordered the crew to make haste as it would soon be daylight and "we want to get out of here before we are seen." The Laurada then proceeded to a point on the high seas several miles off Barnegat, where she met a tug and the American schooner Donna M. Briggs about three or four o'clock in the afternoon. The schooner was laden with a large quantity of arms, ammunition and munitions of of war, including, among other things, from eight to twelve cannon. No signals were exchanged between the Laurada and the tug or schooner. The Laurada lowered a life boat, which brought General Roloff from the tug to the steamer. On the following day Captain O'Brien came aboard the Laurada from the schooner. Both Roloff and O'Brien remained on the Laurada until she reached Cuba. It ap-

pears that when the Laurada met the schooner as above described the water was rough and the schooner was towed away by the tug, an understanding having been had with Hughes that the schooner would return to the Laurada on the morning of the following day. Accordingly, during the forenoon of the next day, the schooner was brought back. During the same morning and shortly after the arrival of the schooner a barge or lighter was brought by another tug to the Laurada, that tug apparently hailing from New York. In the lighter were a large amount of munitions of war in boxes and between forty and fifty men, the majority of whom, according to the evidence, were Cubans. The lighter also contained provisions for the use of these men. The lighter was brought alongside of the Laurada and her cargo was transferred to that steamer, the men who came out on the lighter passing its cargo from the lighter to the crew of the steamer. This operation occupied about two hours, and it was not until after the cargo of the lighter had been so transferred to the Laurada that the men in the lighter came aboard of the steamer. These men brought their provisions, and it does not appear that they either paid or agreed to pay for their passage on the Laurada. While the provisions and munitions of war were being so transferred to the Laurada, she was some three or four miles off Barnegat. There is also testimony to the effect that three or four men were taken on the Laurada from the tug accompanying the lighter. After the men and cargo of the lighter had been taken on board of the Laurada she promptly started with the schooner in tow for San Salvador, and, after a voyage of about six days, sighted that island. At the time of the transshipment off Barnegat, the name of the schooner was not concealed, but when San Salvador was reached her name was covered with canvas. A short distance from the shore of San Salvador the Laurada and the schooner separated and tacked about, sometimes in sight and sometimes out of sight of land, and sometimes in sight and sometimes out of sight of each other, but seeing each other once each day. This continued for at least eight days. Hanson testified that the chief mate of the Laurada told him that "they were waiting for a steamer to come up" and take the cargo from that vessel and also the cargo from the schooner. Hurley testified that it was appointed that a steamer should meet the Laurada and take her cargo and the cargo of the schooner, and that it was spoken about on the Laurada. The expected steamer, however, did not appear, and, according to the testimony of Hurley, Hughes and Roloff, March 17, "put their heads together and they allowed they could not wait any longer. So far as I could hear, the whole thing ought to have been done on the fourteenth or inside of the fourteenth. * * * And this was on the seventeenth. So they put their heads together and they allowed to take the cargo out of the schooner and put it aboard the Laurada, and the Laurada to run the risk and run it in herself." The result of this consultation was that on the evening of the same day the Laurada and the schooner came together close to San Salvador, and the work of transferring the cargo of arms, ammunition and munitions of war from the schooner to the steamer began; the men who had been taken on board the steamer off Barnegat and her crew co-operating in this work. It took two nights to effect the transshipment of

the cargo; the vessels separating before daylight after the first night, and not meeting until it was dark on the second night. The cannon taken from the schooner were put down between decks in the Laurada. Hurley testified that the reason that the vessels remained apart from each other during the day was because they were afraid they might be seen by some of the English cruisers, as they were in English waters, and that on the second night of the unloading they saw a vessel which they thought was a revenue cutter and quickly cut the line between the steamer and the schooner, which separated and afterwards came together the same night. No part of the cargo of the schooner was transferred to the Laurada until after the consultation between Hughes and Roloff off San Salvador. On either the first or second night of the unloading,—for there is some discrepancy between the witnesses as to the day,—Hughes told the men on the Laurada, that "he was going on a bit of an expedition. * * * He said, anyone that wanted to go with him to come on the other side of the deck. We were all on one side of the deck, and he said, those that wanted to go with him to come on the other side, and we all went over except the chief mate." No inducements were offered to the men to go on the proposed expedition, nor does it appear that Hughes or any other person explained to the men the nature of the expedition. All of them, however, with the exception of the chief mate of the Laurada, without any hesitation, indicated their willingness to go. Hanson testified that they were given their choice whether they would go or not, but that "one of the fellows wanted to back out," but "the captain of the schooner chased him back aboard the steamer again, so he had to go with us." After the transfer had been completed the chief mate of the Laurada and the wife of Hughes went off on the schooner, and the steamer, starting early in the morning while it was dark, proceeded to a small island or key at which she arrived early in the morning of the next day, and there cast anchor and remained for about twelve hours. Hanson testified that immediately after the Laurada parted with the schooner at San Salvador boxes were broken open, arms were taken from them and placed in piles and the boxes were thrown overboard. He also testified that while the Laurada remained at the small island or key two cannon were mounted on wheels on her stern; that there was nothing done with these cannon, "only just had them rigged up"; that they were taken ashore after they reached Cuba; and that he was told by some of the Cubans that the cannon had been mounted on the Laurada for protection "against the Spanish man-of-war." Hurley testified that while the Laurada lay at this small island two cannon and a repeating rifle were mounted on her quarter; that they were mounted in case a Spanish man-of-war should follow them; "to protect us and to protect the vessel" against a Spanish man-of-war; that Roloff and Hughes "examined to see how the guns were mounted"; that he heard a conversation between Hughes and Roloff, in which "they made the remark that if one of those guns should hit her [a Spanish man-of-war] within a mile, it would blow her decks off"; that during that day accoutrements and uniforms were served out and the Cubans "commenced to rig themselves up in their uniforms," and also drilled; that their uniforms were in boxes on the

vessel and he saw them open the boxes and take them out; that he saw from seven to ten men drilling with rifles; and that during the same day he sharpened swords for some of the officers. Lund testified that two cannon were mounted "right aft"; and that after the Laurada left the key on her way to Cuba, Roloff opened a couple of boxes of cartridges. Hanson testified that on the way from the key to Cuba the Cubans took some of the arms and armed themselves with them. The Laurada left the key between one and four o'clock in the afternoon and reached Banes Bay in the easterly portion of Cuba late at night on the same day, where she anchored. The anchor was attached to a hawser, instead of a chain, to avoid making any noise. Here the Laurada sent out about midnight a small boat to reconnoitre which shortly returned, reporting that everything was clear. It appears from the testimony that after the return of the small boat the Laurada sent out two boats; one of them to go up the bay to see if "everything was all right to go up," and the other with four sailors and a number of Cubans; and that those in the latter boat placed two torpedoes in the channel between the capes of the bay connecting them with the shore on one side by means of a wire and electric battery, and with the shore on the other side by means of a line. It also appears that one of the cannon, which, according to the testimony, had been mounted on the deck of the Laurada, was about the same time put ashore at or near the mouth of the bay. The two boats got back at or shortly before daylight, giving a satisfactory report, and the Laurada then proceeded up the bay looking for a place suitable for landing her cargo. Hurley testified that, while searching for such a place, a row boat was seen at some distance from the Laurada coming toward her; that Hughes said, "I am going to steer for that boat to see what she is," and that Roloff made the remark, "Don't you go for that; that is a Spanish boat; let her alone. You go up that creek, and I believe you will find a place to land there." Finally the Laurada reached a secluded spot where she ran as close to land as she could, made fast, placed side by side between her and the land three of the five boats she had taken on board off Cape Henlopen, and laid planks across the boats in such a manner as to form a passage-way from her to the land. This having been done, all of her cargo was carried ashore, the men taken on board off Barnegat assisting the crew in this work, which was completed early in the evening. Roloff and all the men who joined the Laurada off Barnegat, with the exception of O'Brien, Dr. Castello, three Cuban pilots and two other men, then went ashore, and did not return to the steamer. The five boats received off Cape Henlopen were left on the bank at the place of landing, and the Laurada, going down the bay at full speed, put to sea, and taking a northerly course cast anchor in the Delaware River about two miles below the mouth of the Christiana River, March 26, between three and half past three o'clock in the morning. Between four and five o'clock of the same morning, Hughes, O'Brien, Dr. Castello, and some of the other men who had returned from Cuba on the Laurada, left her and came in a small boat up the Christiana river and got ashore in Wilmington. Where Hughes went or what became of him afterwards the evidence does

not disclose. From the time the Laurada reached Banes Bay until she left it was about twenty four hours. Hurley testified that he knew Roloff was a general "because everybody called him so and he was respected so"; that the captain of the tug, at the time Roloff was transferred from it to the Laurada off Barnegat, said to Roloff, "Good bye, general. I hope to see you soon back again free;" to which Roloff replied, "You will never see me otherwise. If I don't come back free, you will never see me." He further testified that he talked with the Cubans a number of times on the way down from Barnegat and that they told him what they were going for and what they were going to do, telling him that they "were going to lick the Spaniards"; that "every passenger we had on board was a soldier"; that a large proportion of the passengers were officers; that some five or six of the latter had been in the Peruvian and Chilian armies, as he was told by one or two of them, who pointed out to him the others. Hanson testified that he heard the men who were taken on the Laurada off Barnegat say that they were "going down to fight the Spaniards in Cuba." Lund testified that the men who assisted the crew of the Laurada in landing her cargo in Banes Bay were Cuban soldiers; that he knew they were such because they told him that they were Cuban soldiers, and "there was fighting down there"; and that he knew Banes Bay was in Cuba because "the soldiers told me so. * * * And after I saw the soldiers and heard them talking, I thought it must be Cuba."

Several witnesses, who, since the Laurada arrived at Wilmington, went on board of her, testified on behalf of the claimant that they did not observe any tracks, carriages or appliances on her for the use or carriage of guns. This testimony, with the exception of that of Chesbrough, is wholly inconclusive. Chesbrough testified that he was a naval architect, and that a few days before the giving of his testimony he examined the Laurada for the purpose of ascertaining whether she showed any evidence of having or having had any appliances for the carriage or use of guns; that on careful examination he failed to discover any such evidence; that no guns of effective size could have been mounted on the deck of the Laurada for use without fastenings; that such fastenings would have left marks upon the deck; and that he did not find any such marks. The claimant did not produce as a witness anyone who accompanied the Laurada on the trip in question, although it appears that two of her crew were present at the taking of evidence in this case. I attach but little importance to the testimony of Chesbrough so far as his opinion is based upon his failure to find marks of the mounting or fastening of guns on the deck of the steamer. That she was provided with planks is beyond doubt. She made use of them in landing men and munitions of war in Banes Bay. If guns were mounted on the Laurada, it is not unlikely that such use was made of those planks as to avoid leaving any evidence on the deck of such mounting. Hanson, Hurley and Lund, all of them members of the crew of the Laurada, testified positively that at least two cannon were mounted while the Laurada lay at the small key or island near Banes Bay. They could not have been mistaken on this point. They either deliberately swore falsely

or told the truth. While there are some minor discrepancies and doubtless some exaggeration in the testimony of these witnesses, in the main their story of what occurred during the trip is consistent, and not unnatural. Although it was in his power, the claimant has not produced any officer or sailor on the Laurada or any other person, who had personal knowledge of the transactions which occurred on her, to contradict the witnesses for the government. The evidence does not circumstantially disclose how the cannon were mounted. Hanson says that they were mounted on wheels,—that they were "rigged up." Hurley says they were mounted, and that Hughes and Roloff "examined to see how the guns were mounted." Lund also says that they were mounted. That the Laurada after reaching Wilmington did not display such marks on her deck as one might expect to result from the scientific or proper mounting and fastening of cannon does not, under the circumstances, countervail the direct proof made on behalf of the government. Nor is it improbable that a body of determined men, in possession of cannon and munitions of war, bent on a desperate enterprise, and carrying their lives in their hands, should have mounted guns, although in an insecure and unscientific manner, for their protection against such vessels as might pursue them with hostile purpose.

It was urged in argument on behalf of the claimant that the trip of the Laurada was of a purely commercial nature, and that, while she might have been captured or destroyed by Spanish cruisers, there was no infraction of our neutrality laws. The evidence, however, leaves no doubt that she was provided by Hughes, not to be engaged in merely a commercial venture, but to convey, from the point on the high seas off Barnegat, where she met the schooner and the lighter, either to the vicinity of San Salvador where she waited for the expected steamer, or to Cuba, a military expedition or enterprise from the United States against the Spanish government in Cuba. In U. S. v. Murphy, 84 Fed. 609, this court, speaking of what would constitute a military enterprise, used the following language, equally applicable to a military expedition:

"Where a number of men, whether few or many, combine and band themselves together, and thereby organize themselves into a body, within the limits of the United States, with a common intent or purpose on their part at the time to proceed in a body to foreign territory, there to engage in carrying on armed hostilities, either by themselves or in co-operation with other forces, against the territory or dominions of any foreign power with which the United States is at peace, and with such intent or purpose proceed from the limits of the United States on their way to such territory, either provided with arms or implements of war, or intending and expecting and with preparation to secure them during transit, or before reaching the scene of hostilities, in such case all the essential elements of a military enterprise exist. It is not necessary that the men shall be drilled or uniformed or prepared for efficient service, nor that they shall have been organized, according to the tactics, as infantry, artillery or cavalry. It is sufficient that the military enterprise shall be begun or set on foot within the United States; and it is not necessary that the organization of the body as a military enterprise should be completed or perfected within the United States. Nor is it necessary that all of the persons composing the military enterprise should be brought in personal contact with each other within the limits of the United States; nor that they should all leave those limits at the same point. It is sufficient that by previous arrangement or agreement, whether by conver-

sation, correspondence or otherwise, they become combined and organized for the purposes mentioned, and that by concerted action, though proceeding from different portions of this country, they meet at a designated point either on the high seas or within the limits of the United States. Under such circumstances a military enterprise to be carried on from the United States exists within the meaning of the law. * * * The fact that the cargo of arms and munitions of war on the Laurada was in excess of the amount that could be used in warlike operations by the men who were transferred to the Laurada off Barnegat is not of itself inconsistent with the existence of a military enterprise on the Laurada."

The evidence excludes the idea that Roloff and the other men who were taken on board of the Laurada off Barnegat were either merely stevedores or passengers bent on pleasure or business of a peaceful nature; or that they were unassociated individuals who, without preconcert or combination among themselves, sought transportation with the sole intention of enlisting in Cuba in the cause of the Cuban insurgents. They proceeded from the United States, and went aboard of the Laurada by preconcert and in a body. Arms, ammunition and munitions of war were in their possession and subject to their control and use. They broke open boxes and armed and uniformed themselves. They drilled. They declared their intention to fight the Spaniards in Cuba. When Hughes off San Salvador, after waiting over a week for an expected steamer, proposed that they should go on an expedition, which was in fact an expedition to Cuba, they neither expressed surprise nor asked for any explanation of the purpose of the expedition, but instantly signified their willingness to go. One of their number, having repented of his determination, went on board the Donna M. Briggs intending to return north, but was forced to proceed with the expedition. Hughes, in view of his subsequent conduct, must have been aware of the character of the expedition before he left Baltimore. He provided the Laurada and coaled and provisioned her for the transportation of men and munitions of war at least to San Salvador, on their way to Cuba. There can be no reasonable doubt that the men taken on the Laurada off Barnegat were a military expedition or enterprise against Spanish dominion in Cuba. Providing transportation for a military expedition or enterprise to be carried on from the United States is providing the means for it, within the meaning of section 5286 of the Revised Statutes. Wiborg v. U. S., 163 U. S. 632, 16 Sup. Ct. 1127, 1197.

But this libel has been filed under section 5283. Did Hughes, within the meaning of this section, within the limits of the United States fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or was he, within the limits of the United States, knowingly concerned in the furnishing, fitting out, or arming, of the Laurada, with intent that she should be employed in the service of the Cuban insurgents, to cruise or commit hostilities against the subjects or property of the King of Spain? If so, the Laurada, her tackle, apparel and furniture, became liable to forfeiture. If not, whatever other offence Hughes may have committed against the neutrality laws, there can be no decree of condemnation under this libel. It is not necessary to a forfeiture that the furnishing, fitting out or arming of a vessel for the prohibited purpose should be completed within the limits of the United States. It is sufficient that, by prearrangement within

the limits of the United States, the vessel having been procured here, the furnishing, fitting out or arming is to be effected or completed after she has gone beyond those limits. U. S. v. Quincy, 6 Pet. 445; The Carondelet, 37 Fed. 799, 802; U. S. v. The Mary N. Hogan, 18 Fed. 529; U. S. v. Two Hundred and Fourteen Boxes of Arms, Ammunition and Munitions of War, 20 Fed. 50; The City of Mexico, 28 Fed. 148. In The City of Mexico the court said:

"It has been conclusively determined that it is not necessary that the vessel be armed or manned for the purpose of committing hostilities before leaving the United States, if it is the intention that she should be so fitted subsequently."

In The Carondelet the court said:

"When the arming is on the high seas, through another vessel, proof that both were dispatched from our ports as parts of a concerted scheme made here, is justly held proof of 'an attempt, within the limits of our jurisdiction, to fit out and arm' the vessel with intent to commit hostilities, and hence within the statute."

If the men and munitions of war had been taken on board of the Laurada at Baltimore, and if she had there taken the schooner in tow, instead of at the point off Barnegat, the legal aspect of the case would in nowise be changed.

In order that the Laurada may be declared forfeited, it is necessary that Hughes should have had "within the limits of the United States" the intent that she should be employed in the service of the Cuban insurgents "to cruise or commit hostilities" against the subjects or property of the King of Spain. If such intent was not formed within those limits, but only beyond them, there was no offence under the section, and there can be no forfeiture. The intent which is denounced by the section is one which is fixed, absolute and unconditional. In U. S. v. Quincy, 6 Pet. 445, the court, having under consideration section 3 of the act of April 20, 1818, which is substantially the same as section 5283, said:

"The offence consists principally in the intention with which the preparations were made. These preparations, according to the very terms of the act, must be made within the limits of the United States; and it is equally necessary that the intention with respect to the employment of the vessel should be formed before she leaves the United States. And this must be a fixed intention; not conditional or contingent, depending on some future arrangements."

Much stress was laid during the argument on behalf of the government on the proposition that the Laurada, being an American vessel, was to be considered within the limits of the United States, although on the high seas; and that, if Hughes, while on that vessel, either off San Salvador or at any other point on her way to Cuba, was knowingly concerned in furnishing, fitting out or arming her with the intent on his part, first formed at that time, that she should commit hostilities against the subjects or property of the King of Spain, such intent was in a legal sense formed within the limits of the United States, and the Laurada thereby became liable to forfeiture. Assent cannot be given to this proposition. While the United States possesses and exercises jurisdiction over many matters transpiring on American vessels on the high seas, including certain offences committed on them, such vessels are clearly not within the

jurisdiction of the United States in such manner as to be considered within the limits of the United States. Both the language and the well known purpose of the section exclude the construction contended for. So far as pertinent to this case, that purpose is that the United States shall not be compromised in its relations with friendly powers by the use of its soil or waters for the furnishing, fitting out or arming of vessels, or for the making of preparations therefor, with a hostile intent that they should cruise or commit hostilities against those powers. Hostile conduct meditated and originating wholly beyond our soil and waters is not within the scope of the section.

Section 5283, in its application to the libel, requires that the Laurada should, before leaving the waters of the United States, have been intended to "be employed in the service" of the Cuban insurgents, to "cruise or commit hostilities" against the subjects or property of the King of Spain. Either an intent that she should so cruise or an intent that she should so commit hostilities is requisite for her condemnation. There is no evidence of any intent formed in the United States that she should cruise. Indeed the circumstances disclosed repel the idea. Was she or not intended to commit hostilities? It is not the purpose of the neutrality laws in any manner to check or interfere with the commercial activities of citizens of the United States or of others residing in the United States and interested in commercial transactions. Mere commercial ventures in contraband of war are not prohibited by those laws. In The Santissima Trinidad, 7 Wheat. 283, the court said:

"There is nothing in our laws, or in the law of nations, that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure which no nation is bound to prohibit; and which only exposes the persons engaged in it to the penalty of confiscation."

In The Carondelet, 37 Fed. 799, the court said:

"Commercial transactions by neutral nations in contraband of war, according to the long-established doctrine of this country, it must be remembered, are as legitimate and free as traffic in any other description of merchandise, subject only to the risk of capture by the belligerents. A vessel, by merely engaging in bona fide contraband trade, does not violate the statute, or our neutral obligations, even if the trade be in armed vessels."

Nor is it an offence under the neutrality laws to transport unassociated persons from the United States to a foreign country, although they have a known intent to enlist in foreign armies, or to transport such persons, so intending to enlist, and munitions of war, in the same ship. Wiborg v. U. S., 163 U. S. 632, 16 Sup. Ct. 1127, 1197.

In these and other instances serious embarrassment may result to a friendly power, engaged in hostilities, by reason of the men, munitions, arms and engines of war furnished to its enemies from this country. But such traffic and transportation, though liable to interruption through capture by the friendly power for its own protection, involve no breach of a real neutrality on our part, and are permitted by our laws out of consideration for the commercial prosperity of the people. The purpose of the neutrality laws is, however, to prohibit acts and preparations on the soil or waters of the United States, not originating from a due regard for commercial interests,

85 F.—49

but of a nature distinctively hostile in a material sense to a friendly power, engaged in hostilities, and calculated or tending to involve this country in war, whether an incidental or indirect commercial profit does or does not result from them. The invasion by an armed military expedition from this country of the territory of a friendly power, engaged in hostilities, intending and prepared to engage there in military operations against the latter, either in co-operation with or in aid of its enemies, is a gross violation of the soil and sovereignty of that power. Where hostilities have actually broken out and are in progress, the landing of such an expedition on the soil of such a power is not only an unfriendly act, but an act of hostility. If a vessel be provided and coaled and provisioned in the United States, by prearrangement, for the purpose of effecting the landing of such an expedition, with or without the use of force, as occasion may require, she is intended to commit an act of hostility against the friendly power. Is or is not such vessel, within the meaning of section 5283 furnished within the United States with intent that she should be employed to commit hostilities against a friendly power? On the part of the claimant it was contended that it is necessary to the forfeiture of the Laurada that she should have been furnished or fitted out with the intent that she should cruise or commit hostilities against Spain as an engine of naval warfare. It was claimed on the part of the government that it is sufficient if the vessel was furnished with the intent that she should, according to her ability, commit hostilities against Spain, although not in maritime warfare, by effecting the landing of a military expedition on the shore of Cuba, to fight in the cause of the Cuban insurgents against the forces of the King of Spain. There can be little doubt that the primary and principal purpose of the section was to prevent the fitting out and arming of vessels to engage in maritime hostilities against a friendly power.

The term "hostilities" is certainly not expressly limited in its scope by the section to strictly maritime warfare, and may include all hostilities for which a vessel is adapted. A vessel, whether armed or unarmed, is in and by itself a harmless thing. It is the use for which she is intended or to which she is put that determines whether she is an instrument of hostility. It can be of but little importance whether, on the one hand, she carries guns suitable for naval engagements or the bombardment of fortresses, or, on the other, has her crew armed with rifles and ammunition to effect a hostile and violent landing of a military expedition. In either case human agency converts the otherwise harmless thing into an engine of war. In U. S. v. The Mary N. Hogan, 18 Fed. 529, the court said:

"Several examinations by experts on behalf of the government previous to the seizure failed to discover any repairs or preparations indicating any intended service in military or naval operations. No arms, ammunition, or other warlike appliances were on board. From the evidence it clearly appears that though the Hogan was wholly unadapted to effective naval operations against any considerable organized opposition, she could be of the greatest service to the insurgents by her light draught and considerable speed in landing or taking off men at unprotected points on the coast of Hayti by watching her opportunities of running in and out, as well as in offensive demonstrations against defenseless parts of the island, with little to fear from the slight naval resources

of the lawful government. \* \* \* The evidence shows, therefore, a hostile expedition organized and dispatched from our ports in separate parts, to be united at a common rendezvous on the high seas, and to proceed thence to Hayti, in completion of the original hostile purpose with which the different parts were dispatched from our shores. Such an expedition is as much within the prohibition of section 5283 of the Revised Statutes as if all its parts were united and complete upon one single vessel at the moment of its departure."

In The City of Mexico, 28 Fed. 148, the court said:

"Whatever may have been the intention of the legislators regarding the particular class of hostilities they desired to prevent,—all we have to decide from is the language with which they have clothed their ideas, and this is broad enough to include all classes of hostilities. It has been ably argued that unless the vessel is so armed that she herself can be the offending party or thing, or, in other words, carries such an armament as can throw projectiles from her port, or is equipped as a man-of-war or armed vessel, the statute will not apply. The terms 'peaceful' and 'warlike,' 'friendly' and 'hostile,' are thoroughly recognized; and the line so plainly marked between what should be the course and conduct of a vessel engaged in a peaceful commercial venture, and one fitted, prepared, and intended for hostilities, is so distinct and well defined as to permit no mistake, nor require a reference to a judicial decision. A peaceful act, a peaceful voyage, cannot be a hostile one; nor can acts looking towards war or enmity escape from the general term 'hostilities.' \* \* \* But when it is intended that a vessel shall herself be part and portion of a hostile expedition; that she shall carry troops, not for the purpose of making quiet and unopposed landing, and leaving them to take the risk of war subsequently, but making for them, or with them, if found necessary, a forcible and hostile landing; standing ready to put them on shore, or receive them on board defeated; to convey and furnish them with arms, ammunition, and stores; to act as a base of supplies and operations, ready to assist in committing any hostile acts that can be completed by armed men, she sharing all chances of success or defeat, and under the direct orders and control of the commander of a hostile expedition,—it cannot be admitted that her acts would be anything but hostilities. A vessel is a passive instrument, and is but made the means of success; and it matters but little, in the effect of her hostilities, whether she throw shot and shell from her ports, or dispatch boat-loads of armed men from her gangways."

There was some evidence, however, in both of these cases tending to show not only that the vessel was to be employed in the service of the insurgents, but an intended armament of the vessel. No case has been cited, nor am I aware of any case, which directly supports or refutes the proposition, that, if Hughes provided, coaled and provisioned the Laurada in Baltimore with intent then and there that she should transport a military expedition from the United States, in aid of the Cuban insurgents, to Cuba and there effect the landing of that expedition with arms and munitions of war, he, within the meaning of the section, knowingly was concerned in the furnishing of that vessel with intent that she should be employed in the service of the insurgents to commit hostilities against the subjects or property of the King of Spain. The decision of this case does not require the determination of that point. A forfeiture cannot be declared unless Hughes, while within the limits of the United States, intended that the Laurada should commit hostilities against such subjects or property. If it be assumed that the landing by the Laurada of the expedition on the shore of Cuba might have constituted hostilities within the meaning of the statute, it was necessary that the furnishing of that vessel should have been with the intent, within the limits

of the United States, that she should be the instrument to effect such landing. The proof, however, is otherwise. The evidence shows that the intention of Hughes, in furnishing the Laurada with provisions and coal and clearing from Baltimore, was that she should carry a military expedition, begun or set on foot within the United States against Spanish dominion in Cuba, to or near San Salvador, and also that she should tow the schooner Donna M. Briggs, with her cargo of arms, ammunition and munitions of war for the Cuban insurgents, to or near the latter island, and that the military expedition and the cargo of the schooner and her own cargo should there be transferred to a steamer, to be carried to their destination in Cuba. The Laurada with the schooner having reached San Salvador, the expected steamer did not appear, and after some delay the cargo of the schooner was transferred to the Laurada, and she thereupon proceeded to Banes Bay where she landed the military expedition and munitions of war. While the destination of the expedition and munitions of war, together with the life and surf boats received off Cape Henlopen, was Cuba, there can be but little doubt that the destination of the Laurada, as planned and intended by Hughes before leaving Baltimore, was a point near San Salvador, and not Cuba. Several circumstances are material in this connection. The Laurada was supplied with 200 tons of coal in Baltimore; but practically the same quantity of coal which is required for a trip to Cuba is necessary for a trip to San Salvador. No witness has testified to any declaration by any person on the Laurada, or to any understanding on her, before the consultation between Hughes and Roloff at San Salvador, that she was going to Cuba, although a number of statements by the men who were taken on board off Barnegat as to where they were going and what they were going to do are in evidence. The Laurada, after reaching a point near San Salvador waited for more than a week before the cargo of the schooner was transferred to her. The evidence shows that during that time it was understood on the Laurada that she was awaiting the arrival of a steamer which was to take her cargo and that of the schooner. It was only after Hughes and Roloff consulted together and concluded that they could not wait any longer; and that the Laurada should take the risk of proceeding, that the cargo of the schooner was transferred to her. And it was not until after this determination had been reached that Hughes proposed to the men who had been received off Barnegat that they should go with him "on a bit of an expedition." If the original intention had been that the men were to go all the way to Cuba on the Laurada, why should that proposal have been made? If, however, they had understood that they were to be transferred to another steamer, which in fact failed to appear, the proposal by Hughes was natural and to be expected. No cannon were placed on the Laurada until after it was determined by Hughes and Roloff that she should proceed to Cuba. It is possible that no steamer was expected by Hughes to meet the Laurada at or near San Salvador; that he intended and understood before leaving the United States that the Laurada was to proceed to Cuba and there land the military expedition together with the munitions of war; and that the delay near San Salvador,

the consultation between himself and Roloff, and his proposal that the men on the Laurada should go on an expedition, were parts of a fraudulent scheme by which the original destination of the Laurada should be made to appear to be other than in fact it was. It is also possible that Hughes, while expecting that a steamer should by pre-arrangement meet the Laurada off San Salvador, intended, before leaving Baltimore, that the Laurada should take the military expedition and the munitions of war to Cuba, in the event of the failure of such steamer to meet the Laurada. But in view of the evidence it is inadmissible to indulge in such surmises. The only legitimate conclusion in this connection is that there was·a change of plan and intention on the part of Hughes at San Salvador, in that, while his original understanding and intention were that the Laurada should deliver her cargo and that of the schooner and transfer the military expedition to a steamer at or near that island, he, after waiting in vain for the expected steamer, then for the first time determined that the Laurada with the men and munitions of war should proceed to Cuba.

It was urged on the part of the government that even if the original design was that the Laurada should transfer the military expedition, together with the munitions of war to the expected steamer at or near San Salvador, and not go to Cuba, there was a scheme or plan, prearranged within the limits of the United States, under which the Laurada and the other steamer were to meet and co-operate in carrying out the unlawful purpose of landing the expedition in Cuba, and that the Laurada furnished a link in the chain of criminality, and that, therefore, she offended in the same manner as if she had been originally intended to effect the landing in Cuba. I have given much consideration to this point, but am unable to adopt that view. The Laurada is guilty, if at all, only in so far as the intention of Hughes, formed, in this country, with respect to her use, made her guilty; and she could not be guilty unless she was intended as the instrument to commit hostilities. The transportation of the military expedition over a part of its way to Cuba did not constitute hostilities, although Hughes might have been punished under section 5286 for providing means for such an expedition. If the expected steamer had appeared pursuant to prearrangement made in this country and had taken the military expedition from the Laurada off San Salvador to Cuba, then if either vessel was guilty, it would have been that steamer and not the Laurada. In the case of The Carondelet, above referred to, the libel was filed against that vessel, under section 5283, alleging that she had been fitted out and armed, and laden with cannon, arms and munitions of war, with intent to enter into the service of "certain rebels in insurrection against the organized and recognized government of the republic of Hayti, and to commit hostilities against the subjects, citizens, and property of that republic." It was claimed on the part of the government that "either on the high seas or at Samana the arms are to be transferred to the steamer Madrid, now fitting up for warlike uses at this port, and nearly ready to sail; that the Madrid, thus armed, is to join Hippolyte's forces; and that the Carondelet is a mere tender to this enter-

prise." The court, while dismissing the libel on the ground that nothing but a commercial transaction with the Dominican republic was involved, said:

"If there were reasonable grounds to suspect that the Madrid is not designed to go to Samana, to be delivered there in completion of a contract of sale to the Dominican republic, but to go direct to Hippolyte, taking her armament, by a preconcerted arrangement, from the Carondelet on the high seas, in that case, whether the Carondelet could or could not be refused a clearance under section 5290, the Madrid, according to the cases of The Meteor [17 Fed. Cas. 178] and The Mary N. Hogan, 18 Fed. 538, might be seized and forfeited under section 5283; but not the Carondelet; for the latter, upon the facts assumed, would not be designed 'to cruise or commit hostilities' against any-one, but only to complete the arming of the Madrid, which is not a ground for forfeiting the Carondelet. She might be captured by the belligerents, but would not come within our statute."

I am forced to the conclusion that the proceedings against the Laurada cannot be sustained; and the libel is therefore dismissed.